Adolph Coors Co., Adolph Coors, Jr., and May Kistler Coors, Joseph Coors and Holly H. Coors v. Commissioner.
Adolph Coors Co. v. Commissioner
Docket Nos. 3179-66, 3180-66, and 3181-66.
United States Tax Court
T.C. Memo 1968-256; 1968 Tax Ct. Memo LEXIS 43; 27 T.C.M. (CCH) 1351; T.C.M. (RIA) 68256; November 7, 1968, Filed Gene W. Reardon, 2150 First Nat'l Bank Bldg., Denver, Colo., for the petitioners. Richard *44 J. Shipley, for the respondent. 1352 MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of the petitioners as follows: Year
Adolph Coors Co.
Adolph Coors, Jr.&
Joseph and Holly H. May KistlerCoors H. Coors
1962
$1,515,137.09
$7,650.00
$4,919.99
1963
873,545.20
7,650.00
5,933.27
1964
4,213,516.29
6,705.00
6,334.63
The issues requiring decision in the corporation case are: 1. Were the earnings of the company accumulated in each year beyond its reasonable needs to avoid tax on its shareholders, 2. Did two beer cellars and four barley receiving stations qualify as "Section 38 property" for investment credit purposes, and 3. Are costs of repairs and utilities on house No. 1 and depreciation on houses Nos. 1 and 2 deductible. The issues for decision in the cases of the individuals are: 1. Did the Commissioner err by including in income rental values of houses belonging to the company and occupied by the petitioners, and 2. Was a fee paid by Joseph to an attorney to apply for and receive a patent deductible as a business expense. Paragraphs 29 and 40 of the *45 stipulation are agreements to two adjustments favoring the corporation. The Commissioner in his brief abandons the disallowances of deductions made in the deficiency notice of $405,567.07 for 1962, $560,942.25 for 1963 and $310,866.81 for 1964 representing corporation costs of construction overhead and maintenance and costs of engineering department overhead. He also abandons disallowances of $59,009.60 for 1962, $95,931.71 for 1963 and $122,076.56 for 1964 representing depreciation on construction equipment of the corporation. Findings of Fact Adolph Coors Co. (hereinafter referred to as the corporation) is a Colorado corporation. Its principal place of business at all times material hereto was at Golden, Colorado. Its federal income tax returns for the years 1962, 1963 and 1964 were filed with the district director of internal revenue at Denver, Colorado. Adolph Coors, Jr. and May Kistler Coors are husband and wife and their legal residence at all times material hereto was Golden, Colorado. They filed joint federal income tax returns for the years 1962, 1963 and 1964 with the district director of internal revenue at Denver, Colorado. Joseph Coors and Holly H. Coors are *46 husband and wife and their legal residence at all times material hereto was Golden, Colorado. They filed joint federal income tax returns for the years 1962, 1963 and 1964 with the district director of internal revenue at Denver, Colorado. The deficiency notice to Adolph Coors Co. first states the deficiencies determined as listed above. Then the following is the first paragraph of the text of that document: In accordance with the provisions of existing internal revenue laws, notice is given that the determination of your income tax liability for the above-noted taxable (years) discloses a deficiency (or deficiencies) in the (amounts) shown above. The attached statement shows the computation of the deficiency or deficiencies. The computations in "The attached statement" show for each year how those deficiencies were computed and also show how an accumulated earnings tax for each year was computed. "The attached statement" also contains a paragraph as follows: It is determined that for each of the years ending December 31, 1962, 1963 and 1964, you were formed or availed of for the purpose of avoiding the income tax with respect to your shareholders by permitting earnings and *47 profits to accumulate instead of being divided or distributed. Accordingly, the accumulated earnings tax as provided by section 531 of the Internal Revenue Code is asserted for each of those years. The amounts "asserted for each of those years" were $1,245,567.97 for 1962, $560,073.37 for 1963 and $4,076,129.43 for 1964. The Commissioner, in computing the income tax deficiencies and the "asserted" accumulated earnings tax against the corporation for each year, used the following amounts as the corporation's taxable income and accumulated earnings tax net income: Year
Taxable Income
Accumulated Earnings
Tax Net Income
1962
$20,210,906.60
$ 3,263,812.91
1963
21,657,879.44
1,483,307.46
1964
27,723,068.14
10,615,920.59 All of the above amounts are erroneous and their use by the Commissioner in 1353 determining the deficiencies and "asserting" the accumulated earnings taxes resulted in the determination of erroneous deficiencies and in the assertion of erroneous accumulated earnings taxes. William K. Coors and Joseph Coors are sons of Adolph Coors, Jr. The principal officers of the corporation during the *48 tax years were: William K. Coors, president and chairman of the board; Joseph Coors, executive vice president; Adolph Coors, Jr., treasurer; and Ray V. Frost, financial vice president and secretary. These officers and Herman F. Coors, now deceased, comprised the Board of Directors. Herman F.&Coors resided in Arizona. The capital stock of the corporation as of December 31, 1964 was as follows: *10 Authorized Treasury
Out-standing
Class A voting common stock ($100 par value)
12,000
687
11,313
Class B, no par, nonvoting common stock
440,000
30,054
409,946 This capital stock structure remained unchanged throughout the years 1962, 1963 and 1964 with the exception of a redemption by the corporation for $507,500 of 7,000 shares of Class B stock from the Bertha Coors Monroe Estate in October 1963. A preferred stock dividend of $10,000,000 was issued in 1951 by the corporation to holders of the common stock. A preferred stock dividend of $1,000,000 was issued to holders of preferred stock in 1957. The capital stock was thereafter issued under a 1959 plan of recapitalization in which the corporation's common stock was reclassified as Class *49 A common stock and its preferred stock was changed into Class B common stock. The corporation had the right under its Articles of Incorporation and By-laws of first refusal to purchase at market value any of its outstanding shares of capital stock which were being offered for sale. All of the outstanding shares of Class A common stock were held in trust during the tax years under a trust agreement executed on January 7, 1922. That agreement as amended provides that the trustees shall have and exercise the voting powers with respect to the Class A stock. The amendment to the said trust agreement dated July 10, 1959 contains the following statement as to purpose of the trust: WHEREAS the intention and purposes of said trust agreement as amended were and this amendment is to unify, protect, preserve, and develop to the greatest possible advantage and benefit the interests of the members of the Adolph Coors family as the beneficiaries under said Trust Agreement as Amended, and to that end to preserve the continuity of management and of the managing personnel of Adoph Coors Co. * * * The shareholders were given trust receipts in place of their capital stock, and the corporation *50 had the right of first refusal to purchase any trust receipts being offered for sale. Trust receipts representing beneficial interests in the shares of Class A stock were held as follows during 1962: William K. Coors
1,625 shares
Joseph Coors
1,625 shares
Adolph Coors, Jr., as Trustee of 1923 Trust of Adolph Coors
4,500 shares
Trustees of Trust of Adolph Coors, Jr.
1,750 shares
Trustees of Trust of Grover C. Coors
1,063 shares
Trustees of Trust of Bertha Coors Monroe 750 shares
Total
11,313 shares The trustees under said trust during the tax years were: Adolph Coors, Jr., Herman Coors, William K. Coors and Joseph Coors. Those holdings continued throughout the tax years except that in about March 1963 the 750 shares of the trust of Bertha Coors Monroe were purchased equally by William K. Coors and Joseph Coors. The following Class B shares of the corporation were held as of December 31, 1964 in the following amounts by trusts (created in the years indicated) of Adolph Coors and the Trusts of the latter's three sons and three daughters: Adolph Coors (1923)
165,004 shares
Adoph Coors, Jr. (1946)
64,168 shares
Grover C. Coors (1952)
37,860 shares
Herman F. Coors (1946)
65,914 shares
Augusta Coors Collbran (1946)
28,250 shares
Bertha Coors Monroe (1946)
16,500 shares
Louise Coors Porter (1946) 28,250 shares
Total
405,946 shares
*51 All of those trusts, except the irrevocable trust created by Adolph Coors of which Adolph Coors, Jr., is sole trustee, were created as revocable trusts but they have or will become irrevocable upon the death of the respective settlors. The trustees of the six trusts are the same individuals as the trustees of the 1922 Voting Trust, except that Adolph Coors, Jr., is not a trustee of his own trust and Herman F. Coors was not a trustee of his trust. The beneficiaries of 1354 each of the Class B trusts are either the respective settlors or their relatives. William K. Coors and Joseph Coors each owned 2,000 Class B shares on December 31, 1964 which they obtained from the Estate of Bertha Coors Monroe in 1963. Apart from this transfer and the redemption in 1963, the Class B shareholdings continued unchanged throughout the years involved. The brewery business was started in 1873 by Adolph Coors and in 1913 it was incorporated under the laws of Colorado. The principal business of the corporation is the production and sale of beer and malt. The ingredients of its beer are Rocky Mountain Spring Water, hops, barley and rice. The Rocky Mountain Spring Water is obtained from wells drilled *52 by the corporation on land in the vicinity of Golden, Colorado. The corporation purchases most of its hops which are grown in the Bavarian section of Western Germany. It buys from farmers and conditions its barley within the State of Colorado. It purchases its rice, which is grown principally in California. The finished beer is placed in bottles, cans and kegs at the Golden plant, from where it is promptly shipped, either by railroad car or truck, and sold to its 180 distributors throughout eleven Western States of the United States. The corporation employs numerous engineers, and it conducts its own planning, designing, development and architectural work at its brewery plant. Many of the planned projects of the engineers are scrapped and abandoned. The corporation's expansion projects are planned months to years in advance of the actual starting. The corporation erects buildings and other physical structures, as additions to its brewery plant, from the plans drafted and approved by its engineers and management. The corporation uses its own equipment and work force to build these structures, and it does its own repair and maintenance work. The corporation also designs, builds and *53 installs machinery and equipment which are used in the operation of its brewery plant. The corporation owns and operates a very modern, complete and independent brewery plant. The corporation has limited storage facilities for its packaged beer, and consequently its beer is mostly shipped to its distributors as soon as it is packaged in kegs, bottles or cans. There were 750 breweries in the United States in the late 1940's and only 93 in 1968. The corporation ranked tenth in volume of sales among the nation's brewing companies in 1966 and in 1967 it moved into seventh position. Most of the breweries which rank ahead of the corporation sell their products nationwide and have branch production plants. Adolph Coors Co. has only one production plant. The corporation has not increased the sales price of its beer to its distributors in the last 20 years. The corporation's comparative balance sheets for the ends of the taxable years 1962, 1963 and 1964 disclose the following: 1355 ASSETS
1962
1963
1964
Cash
$ 10,256,797
$ 8,740,398
$ 13,806,244
Tax Ant. Cert. *
2,477,756
2,505,000
8,000,000
Trade Accts. Rec.
3,188,548
3,135,605
3,505,904
Inventories
11,131,945
14,293,912
17,517,935
Prepaid and deferred Charges 278,183
248,047
154,476
Total Current Assets $ 27,333,229
$28,922,962
$ 42,984,559
Investmert in Corporate Securities
793,100
735,866
733,196
Prepayment on Stock Redemption
758,475
94,411
555,939
Fixed Assets 38,276,110
47,081,160
48,841,371
TOTAL ASSETS $67,160,914
$76,834,399
$93,115,065
*54 *10 LIABILITIES AND STOCKHOLDERS EQUITY
Current Liabilities
9,589,231
9,766,367
12,391,315
Non-current Liabilities
965,000
804,433
643,922
Stockholders Equity 56,606,683
66,263,599
80,079,828
TOTAL $67,160,914
$76,834,399
$93,115,065
WORKING CAPITAL (Current Assets less Current Liabilities) $17,743,998
$19,156,595
$30,593,244
NET LIQUID ASSETS (All Cash less Current Liabilities) $ 3,145,322
$ 1,479,031
$ 9,414,929 1356 The demand for Coors beer has constantly exceeded production. Each year there has been an expansion of facilities, an increase in beer production and an increase in sales of 10 to 13 percent over the previous year. The beer production and sales of the corporation have increased from 811,995 barrels in 1953 to 2,772,309 barrels in 1962, 3,053,241 barrels in 1963 and 3,421,132 barrels in 1964. Gross profits increased during this period from $7,811,739 in 1953 to $26,223,855 in 1962, $28,345,824 in 1963 and $32,790,993 in 1964. The corporation continuously carries on a current and a future building and plant expansion program *55 to meet the annual increased demand for its products. This expansion program is carried out without any interruption of the brewery's current output of beer. The expansion program is financed solely from accumulated earnings. The corporation does not borrow any money. The extent of the expansion each year is limited to the corporation's accumulated earnings and its available cash on hand. Its cash position is always low in the early months of each year, particularly in March. Early in 1964 the Board of Directors became alarmed over the corporation's low cash position and caused a temporary curtailment in expansion expenditures but later in 1964 there was a sufficient accumulation of cash to accelerate its construction expansion. The corporation does not and cannot rely solely on future earnings to finance its planned expansion projects because of the uncertainty of the level of such earnings. The following schedule shows the corporation's cash position including bank balances and U.S. Certificates of Indebtedness as of quarterly dates during the tax years: Date
Bank Balances
U.S. Cert. of
Total
Indebtedness
Jan. 1, 1962
$ 9,095,560.60
$1,996,560.00
$11,062,120.60
Mar. 31, 1962
4,488,256.31
1,977,517.22
6,465,773.53
June 30, 1962
6,825,153.56
1,490,270.00
8,315,423.56
Sept. 30, 1962
8,323,399.25
1,986,250.00
10,309,649.25
Dec. 31, 1962
10,256,797.04
2,477,755.56
12,734,552.60
Mar. 31, 1963
7,197,159.67
2,476,973.61
9,674,133.28
June 30, 1963
8,122,661.03
2,482,896.53
10,605,557.56
Sept. 30, 1963
7,621,834.05
2,500,000.00
10,121,834.05
Dec. 31, 1963
8,738,381.79
2,505,000.00
11,243,381.79
Mar. 31, 1964
5,502,880.42
2,700,000.00
8,202,880.42
June 30, 1964
9,477,028.61
3,000,000.00
12,477,028.61
Sept. 30, 1964
15,566,516.36
3,000,000.00
18,566,516.36
Dec. 31, 1964
13,806,244.02
8,000,000.00
21,806,244.02
*56 The expansion of the brewery facilities and the increase in beer production requires additional cash for increases in inventories and accounts receivable and proportionately increased operating expenditures. The corporation neither carries insurance nor does it maintain cash reserves to cover losses from fire, casualty, crop losses, spoilage losses, business interruption losses, or other risks and hazards. A $14,000,000 civil suit for breach of contract was filed against the corporation in the Denver District Court on March 5, 1964. The corporation is not insured against any judgment and does not have any cash reserve set aside therefor. The corporation would like to acquire additional water rights and additional land should either become available. The corporation needs substantial amounts of cash on hand to pay its federal excise taxes for which liability is incurred as the beer is shipped. The corporation has never made any loans to its stockholders and none of its accumulated earnings for the taxable years were invested in nonbusiness assets. The corporation, during the tax years, commenced or had committed itself to 33 building projects. It worked on 22 of them in *57 1962 and the remaining cost, at the end of 1962 on those to which it was then committed, was $35,343,000. It completed 6 in 1963 and worked on 22 others. The remaining cost, at the end of 1963 on those to which it was then committed, was $28,391,000. It completed 5 in 1964 and worked on 20 others. The remaining cost, at the end of 1964 on those to which it was then committed, including the aluminum can plant, was $48,055,000. At that time it knew that 1357 the cost of land for the can plant would be $1,500,000 and that the plant would need $2,400,000 for aluminum cooperage. The corporation paid federal and state taxes of over $119,000,000 during the tax years. It paid $5,909,682.20 in 1963 with the filing of its federal income tax return for 1962, $5,540,343.28 in 1964 for 1963 and $7,075,674.44 in 1965 for 1964. It also filed and paid substantial taxes on its declaration of estimated tax for each year, including the year 1965. The corporation had no accumulated earnings beyond the reasonable needs of its business at the end of any of the years 1962, 1963 or 1964. The total dividends paid by Adolph Coors Co. were as follows: Year
Dividends Paid
1962
$513,910.80
1963
511,810.80
1964
505,510.80
*58 Since its incorporation in 1913 the company policy has been to keep the corporation's stock within the Adolph Coors family. This policy has applied to both the Class A and Class B stock. The purpose of this policy is to avoid letting "outsiders" interfere with management or learn about company affairs. The principal shareholders of the corporation or holders of beneficial interests under the various trusts in recent years have been the six sons and daughters of Adolph Coors who died in 1929. The sons were Grover Coors who died in 1954, Herman F. Coors who died in January 1967, and Adolph Coors, Jr. who in 1964 was about 80 years old. The daughters were Bertha Coors Monroe who died in about February 1961, Augusta Coors Collbran who died in about January 1963, and Louise Coors Porter who died in November 1964. The corporation had owned stock of six companies for many years. None had any relation to its business. The corporation received income from dividends as follows: Year
Dividends
1962
$332,741.48
1963
411,768.85
1964
416,364.89
The following table shows the dividends received from the corporation during the tax years and the minimum tax rates *59 at which any additional dividends would have been taxed: Stockholder
Year
DividendsReceived
Maximum TaxBracket
Adolph Coors, Jr
1962
$144,646.24
89%
1963
144,646.24
89%
1964
142,009.52
76.5%
William K. Coors
1962
1,950.00
84%
1963
2,887.50
72%
1964
11,656.88
63.5%
Joseph Coors
1962
1,950.00
72%
1963
2,887.50
72%
1964
4,640.00
63.5%
Herman F. Coors
1962
105,312.80
75%
1963
105,312.80
75%
1964
102,171.24
66%
Louise Coors Porter
1962
60,116.00
75%
1963
60,116.00
75%
1964
44,239.00
58.5%
Cellars 11 and 12 are units. Each is an integral part of the brewery through which the beer flows for the fermentation, aging, cooling, filtration and clarification stages of production and storage before being packaged for sale. Every detail of each cellar was specially designed and constructed to accomplish the above steps in the production of the finished product. They have no other use. The corporation constructed a shell and steel supports to enclose and support very large beer tanks and related equipment, all of which was known as Cellar No. 11. Construction on this facility was started *60 in 1961 and completed and put in use in 1963. The corporation expended $612,763.61 in 1962 and $9,734.76 in 1963 on Cellar 11. It is subject to depreciation and it has a useful life of over eight years. The corporation constructed a similar shell and steel supports to enclose and support beer tanks and related equipment known as Cellar No. 12. Construction on this facility was started in 1962 and was completed and put in use in 1964. The corporation 1358 expended $37,693.27 in 1962, $1,443,182.22 in 1963, and $298,140.88 in 1964 on Cellar 12. It is subject to depreciation and has a useful life of over eight years. Cellars 11 and 12 are substantially identical. The enclosure for the tanks and equipment of each cellar rests on concrete caissons, which support heavy steel columns. The columns, together with supporting heavy cross beams, support a closely packed honeycomb of 192 large glass-lined metal storage tanks, each weighing 40,000 pounds empty and holding 1,584 barrels of beer. There are a number of levels of horizontal beer storage tanks and a top level (equal to two lower levels) of 50 fermenting tanks within each enclosure. Each fermenting tank has a capacity of 2,000 *61 barrels. Above each fermentor is a stainless steel foam chamber 7 feet high and 12 feet in diameter. The outer walls of each enclosure consist of a four-inch weather barrier insulated by a ten-inch blown glass wool insulation. The top of the enclosure is a weather protecting cover with a six-inch rigid styro-foam insulation that is supported by and bolted to the top of the fermenting tanks. The basement of each enclosure contains the ammonia refrigeration system for the tanks. Fans propel the refrigerated air through air ducts at each end of the enclosure, and the refrigerated air circulated through controlled air baffles located at the base of each level of tanks keeps the beer at a controlled temperature. The highly insulated equipment enclosures of Cellars 11 and 12 were specially designed to accommodate the beer tanks and constitute large refrigeration units, which are absolutely essential to maintain the storage and processing of beer at fixed and controlled temperatures. The refrigeration and air-cooling systems and the temperature controls of each cellar are checked by an employee two or three times daily while the tanks are filled with beer. Periodically an employee checks *62 the pressure on the tanks and takes beer samples for quality control purposes. Three or four employees are required to fill and empty the beer tanks, and two crews of two employees each clean the empty tanks. Around and below the tanks in each cellar there is sufficient room for men to tend the equipment and some space below the tanks is used occasionally to store items temporarily. Cellars 11 and 12 were and are units usable solely for the purposes listed above. Neither is a "building" within the meaning of section 48(a)(1)(B) defining "section 38 property." One of the most important ingredients of the Coors beer is barley. The corporation years ago obtained seeds of barley from Moravia and has worked since then to improve the grain. It sells the seed to farmers who raise the barley and, if it meets the Coors test, sell it to the corporation. There is only one crop of the barley grown each year, and it is essential that the corporation have a one-year supply on hand to insure it against a crop failure. The corporation employs 12 agronomists who work closely with the barley farmers. They supervise and control the planting of the seed, the fertilization, irrigation, and the growing *63 of the barley, the harvesting of the grain, and the storage of the barley in the growers' bins. The seed is distributed to the growers in January and March and is planted by April 14. The growing season for the barley is approximately 100 days. It is harvested in August and placed in storage bins of the growers for a threemonth rest period to overcome dormancy and develop germination to its highest potential. The barley is shipped by the growers in November and December to the nearest field receiving station of the corporation. There it remains in storage under temperature controls for over one year. The corporation constructed a receiving station and barley storage facility at Delta, Colorado which was completed in September 1962 and was placed in service in 1962. It is subject to depreciation and has a useful life of more than eight years. The corporation made a capital expenditure of $237,000.26 in 1962 on the construction of this facility. The corporation constructed a receiving station and barley storage facility at Monte Vista, Colorado. It was started in 1962 and completed and put in use in 1963. The corporation expended $211,207.76 in 1962, $613,828.16 in 1963 and $3,245.46 *64 in 1964 on the construction of this facility. It is subject to depreciation and has a useful life of more than eight years. The corporation started, constructed, completed and put in use a barley receiving station and storage facility at Montrose, Colorado in 1963. The corporation expended $95,310.29 in 1963 in constructing 1359 this facility, which is subject to depreciation and has a useful life of over eight years. The corporation started construction in 1963 and completed and put in use in 1964 a barley receiving station and storage facility at La Jara, Colorado. The corporation expended $2,409.81 in 1963 and $59,506.56 in 1964 in constructing this facility, which is subject to depreciation and has a useful life of over eight years. The facilities at Delta and Monte Vista are essentially similar, although the Monte Vista facility is larger. The Delta storage facility is 100 feet wide and 221 feet long. The storage capacity is 500,000 bushels. The structure has reinforced tapered concrete walls and is covered with a sheet metal roof. It has two conveyor systems, one located in a gallery or monitor at the peak of the roof for loading grain into the bins and another conveyor *65 system located in a tunnel beneath the floor which is used for emptying the bins. There are walkways along each of the conveyor systems by which employees may operate the equipment and service it. There is a mechanical bay area located at the end of the station which is 21 feet by 100 feet in size. This contains cleaning and elevating equipment. At the end of the station next to the mechanical bay area is a structure in which is located the grain temperature controls and thermocouple temperature indicators, and also the truck scale dials. The grain storage facility located at Monte Vista, Colorado is essentially the same as that at Delta. It is, however, considerably larger; it is 110 feet wide and 860 feet long and consists of two wings, 400 feet long, which are divided by a mechanical bay area in the middle which measures 60 feet by 165 feet. This facility has the same type of equipment as the Delta facility. The facilities at Delta and Monte Vista are designed to receive, weigh, clean, store, and later load for shipment to Golden, barley grown in the respective areas of the state. During the fall or winter when the facilities are receiving grain, normally three employees will *66 be there. Later, during the storage period, one man will visit the facility periodically. When the grain is shipped out, one man can ordinarily perform that function. The Montrose and La Jara facilities are essentially the same. They differ from the Delta and Monte Vista facilities in that they are receiving stations where grain can be weighed, received and stored temporarily in a hopper, which is located above a railroad track. The barley then is sent on to either Delta or Monte Vista. The primary difference is that the Montrose and La Jara stations have only temporary storage facilities. Montrose and La Jara have enclosed space for reading the truck weighing scale dial and for operating the truck lift. During the harvest season these stations are normally operated by two employees. After one year, the aging and storage period at the field receiving station, the barley is shipped to the corporation's brewery plant in Golden. There it is processed into malt in one of the corporation's malt houses. The malting process consists of spreading out the barley in compartment beds, mixing it with water for further germination, and later putting the mixed barley through a roasting process. *67 Then the malt is placed in storage for an aging period. The one-day brewing process follows and then the beer is transferred to the cellars. House No. 1 on the brewery premises was owned by the corporation and occupied during the tax years by the corporation's treasurer, Adolph Coors, Jr. and his wife. Depreciation on that house of $9,377.54 for 1962, $12,110.66 for 1963 and $12,161.85 for 1964 was sustained. The Commissioner in the notice of deficiency disallowed that depreciation. The corporation also has owned and maintained house No. 2 on its brewery premises. That house has been occupied since 1953 by its executive vice president, Joseph Coors, and his family. Depreciation on that house of $3,127.91 for 1962, $4,839.39 for 1963, and $5,027.17 for 1964 was sustained. The Commissioner disallowed that depreciation in the notice of deficiency. The Commissioner estimated utility expenses (one-half for each house) for the two aforesaid houses furnished by the corporation to be $2,400 for each year and added $2,400 to the taxable income of the corporation for each year. The utilities for the house occupied by Joseph were paid for by Joseph and were furnished by the Public Service *68 Co. of Colorado. Those expenditures were not deducted by the corporation on its federal income tax returns. The utilities for the house occupied by Adolph Coors, Jr. were supplied by the corporation's power plant. The corporation had commenced the construction of cellar No. 11 in 1961 and 1360 to provide space for it, the property designated as Residence No. 1 was moved a short distance. The cost of salaries, wages and materials for repairs in 1962 incident to the house move amounted to $60,421.50. The corporation expended in 1963 and 1964 additional amounts of $7,763.15 and $20,372.82 for salaries, wages and materials for repairs in connection with Residence No. 1. Those amounts for each of the three years were added to its taxable income in the notice of deficiency. The Commissioner in the notice of deficiency determined that house No. 1 had a rental value of $9,000 per year and added that amount as dividend income to the taxable income of Adolph Coors, Jr. for each of the years 1962, 1963 and 1964. The Commissioner in the notice of deficiency determined that the corporation's house No. 2 had a rental value of $7,235.29 for 1962, $8,725.39 for 1963 and $8,725.39 for 1964 *69 and added those amounts as dividend income to the taxable income of Joseph Coors for each year. House No. 1 was old, built in 1880, and was in a very unattractive location for a residence in the brewery complex. It was occupied during the tax years by Adolph Coors, Jr. and his wife and was regularly used on behalf of the corporation for daily luncheons and frequent business meetings. Adolph Coors, Jr. spent most of his time inspecting and checking all parts and activities at the brewery. It was necessary to the performance of his duties for the corporation and required by the corporation that he reside on the premises of the brewery. No amount may be included in his income on account of his occupancy of house No. 1. The costs of repairs to, utilities for and depreciation on house No. 1 are deductible by the corporation. House No. 2 was occupied by Joseph Coors and his family. It was newer and was in a much better location than house No. 1. However, it was on the brewery property. Joseph was executive vice president and resident manager of the corporation, was very active in the daily operation of the business of the corporation at the brewery and it was necessary to the performance *70 of his duties for the corporation that he reside at the brewery. The rental value of that residence was not taxable to him as income and the corporation is entitled to deduct depreciation on house No. 2. Petitioner Joseph Coors paid $1,253.83 which was claimed on his 1964 return as "expenses relative to research and development of a patent of visual and audio language interpreter." The Commissioner disallowed the claimed deduction. The $1,253.83 included $800 paid to a patent lawyer for obtaining a patent which was granted to the inventor, Paul E. Flury and $450 [1] paid to a law firm to form a corporation. Flury worked for Joseph Coors in some way. The evidence does not show that any part of the $1,253.83 was paid as an incident to any business regularly carried on in 1964 by Joseph. All stipulated facts and exhibits are incorporated herein by this reference. Opinion MURDOCK, Judge: The Commissioner has "asserted" that the corporation accumulated earnings of each year beyond the reasonable needs of its business and this was done to prevent the imposition of tax upon its shareholders which would *71 have resulted from the payment of larger dividends to the shareholders. He does not claim the corporation was formed for that purpose but claims it was availed of for that purpose in each tax year. The Commissioner mailed to the petitioner a notification required by section 534 but the deficiency notice was mailed before the expiration of the 30 days allowed by the Code within which the petitioner could file its statement re accumulated earnings and consequently no statement was filed. The Commissioner, in the statement attached to the notice of deficiency, "asserted" that the corporation had accumulated income beyond the reasonable needs of its business in the amounts of $3,263,812.91 for 1962, $1,483,307.46 for 1963 and $10,615,920.59 for 1964 and that the accumulated earnings tax thereon was $1,245,567.97 for 1962, $560,073.37 for 1963 and $4,076,129.43 for 1964. Those assertions are now obviously incorrect because of concessions of the Commissioner in the stipulation and in his brief, by evidence in this case and by the holding of this opinion on several issues 1361 which, taken together, reduce the corporate income substantially below the amounts used in the notice of *72 deficiency. The first question relating to each year is - were there actual earnings of each year accumulated beyond the reasonable needs of the business. The Commissioner makes a computation in his brief in an endeavor to show that the amounts "asserted" as unreasonable accumulations in the statement attached to the deficiency notice are still correct for each year. [2] We have already stated why they are incorrect. Furthermore, nonsequiturs and factual weaknesses on which the Commissioner's reasoning in his brief is based render his conclusions unacceptable for the purpose of this case. The Commissioner concedes that the petitioner needed a large amount of its current earnings in each year for operating expenses, "working capital." He decides how much by making a complicated computation with a "multiple cycle concept" which computation is not convincing because, as already mentioned, of nonsequiturs and factual weaknesses involved in it. He concludes that the available amounts far exceeded the needs in each year. He unjustifiably belittles too many of the needs of the petitioner for operating expenses, and exaggerates the availability of *73 working capital in his "cycle." How the need for and availability of funds would coincide or fail to coincide in regard to time during each year was an uncertainty with which the petitioner was annually confronted and with respect to which it will have to be allowed some leeway, particularly as to estimated anticipated needs, in a proper decision here. The Commissioner also concedes that in determining excessive profits, all amounts actually spent in each year for construction, less allowed depreciation, must be subtracted from current earnings and, he says, [3] they have been subtracted in the deficiency notice in the approximate amounts of $6,300,000 for 1962, $9,000,000 for 1963 and $2,200,000 for 1964. He subtracted nothing for any incomplete construction or anticipated needs because, he says, all construction "was paid for out of current earnings." Actually construction was paid for out of "accumulated earnings," of which current earnings could become a part only as currently earned during the year. But in any *74 event section 537, I.R.C. 1954, provides that "the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business." The corporation's operations do not and cannot start and stop at the beginning and end of each year, and it had some large reasonably anticipated needs of its business at the end of each tax year. Work was progressing but was not completed on numerous construction projects in each year. This was particularly true in 1964 when construction was delayed temporarily. It was reasonable to retain a large amount of earnings at the end of each year to assure completion of those projects. Substantial funds would also be needed for anticipated increases in inventories, packaging and other increased production and administration costs. A damage suit for $14,000,000 was instituted against the corporation in 1964. It carried no insurance except against damage to others. Because of the substantial amount of construction in progress at all times, the corporation's plant has been generally out of balance, as William Coors testified. That is, all parts of a desired increase in production cannot be completed or even started at *75 the same time or even in the same year. But when a project is started its complement must follow as soon as funds and circumstances permit and retention of sufficient current earnings should be allowed for such reasonably anticipated needs at the end of each year, particularly for 1964. The corporation had, from 1954 to about 1962, been experimenting with the manufacture and use of aluminum cans and had operated a pilot manufacturing plant for four years. Aluminum keeps the flavor of the beer better than cans made of other metals. The cost of an adequate plant to manufacture aluminum cans has been estimated during the tax years at $20,000,000. It was decided in the summer of 1964 to design and build such a plant but construction was not started until after 1964. However, this plant was a reasonably anticipated need of business in 1964 and the cost was going to be large. Work on the plant was started and completed after 1964. Neither party has set forth a computation supported by competent evidence to 1362 determine convincingly the reasonable needs of the business or the excess, if any, of earnings over reasonable needs for any year. The evidence shows that this company was *76 continuously expanding rapidly and substantially in order to remain successful in a very competitive business and it needed funds in large amounts to do that. It had to plan well ahead. Its annual earnings had been increasing in most years but its officers and directors were not unreasonable in retaining substantial amounts of current earnings of the tax years for later needs and use. Beer is a more popular drink in warm weather than in cold. This, no doubt, accounts for the fact that the Coors corporation was lowest in bank deposits in March of each year. The corporation needed funds to carry its operations through the early months of the year when its sales were not bringing in new profits. A part of the funds required in the early months of 1963, 1964 and 1965 to continue construction in progress but incomplete at the end of each year; a part of the funds needed for reasonably anticipated additional construction at the beginning of each year; funds then needed for operating expenses; funds needed for the payment of state and federal taxes in the early months of 1963, 1964 and 1965; reductions and adjustments resulting from the stipulation, substantially reducing the income shown *77 in the deficiency notice, concessions and holdings herein, when combined with deductions properly recognized in the deficiency notice, leave no accumulations of income beyond the reasonable needs of the corporation's business for any of the years 1962, 1963 and 1964. We hold, after considering all of the facts and circumstances, that for none of the years 1962, 1963 and 1964 were the earnings of the petitioner accumulated beyond its reasonable needs and no accumulated earnings tax is due for those years. The Commissioner in his brief concedes that the two cellars and the four receiving stations of the corporation "were used as an integral part of its beer manufacturing business" and that the only question is "Do these facilities come within the definition of a building?" Sections 48 and 38, I.R.C. 1954. Certainly the so-called cellars, numbers 11 and 12, located at the brewery, were important and essential parts of the process used by the corporation in producing its marketable product, beer. Every detail of each was specially designed and constructed for the sole purpose of performing a step in the process of producing the finished *78 product. They had no other use. Beer in a partially finished state flowed into these cellars for the final steps performed by the cellars, fermenting, cooling, aging, filtering, clarifying and storing until the packaging department put the finished beer into kegs, bottles and cans for shipment and sales. These cellars were in no true sense a mere "building" within the meaning of the Code. They were units, each part of which was essential to the whole. Each is an enclosure which is closely combined with the equipment which is a part of it. Even the walls and top of the structure were of a very special design to make the whole an efficient part of the brewery. The cellars were "section 38 property" during the tax years. The members of the Coors family, who have been responsible for the popularity of their beer and the success of their business, have always regarded the barley grown from the seeds they have developed as one of the most important ingredients in the production and popularity of the Coors beer. They develop the seeds for planting and sell them to the barley farmers. The receiving stations have been placed for the convenience of the farmers and have been constructed to *79 receive, store and handle the barley to the best advantage of the corporation. Storage is the main purpose of the receiving stations. The corporation tries to keep available a two-year supply of barley to avoid shortage due to a possible crop failure. The stations are of great importance to the corporation in storing the barley until it is needed for malting at the brewery. The stations have no purpose except those stated herein and were designed and constructed to best accomplish those purposes and no others. The stations were "section 38 property" during the tax years. Cf. Schuyler Grain Co., Inc., 50 T.C. 265; Robert E. Catron, 50 T.C. 306. House No. 1 was old and large for a residence. Its location was most unattractive for a residence. A real estate agent testified that it could not be rented as a residence because of its location. It was occupied by Adolph Coors, Jr. and his wife and was used on behalf of the corporation for daily luncheons and business meetings. Adolph Coors, Jr. was treasurer of the corporation and was very active in the 1363 day to day operation of the brewery. It was important to the corporation and the operation of the business *80 that he reside on the premises. The costs of repairs, utilities and depreciation relating to house No. 1 were deductible by the corporation. No amount should be included in Adolph's income on account of his occupancy of house No. 1. Joseph Coors occupied house No. 2 so that he could be close to the daily operations at the brewery and readily on call should any emergency arise. The corporation provided the house so that he would be close and would thus benefit the corporation. The agreement had been that he would live there for those purposes. The rental value of the house was not taxable as his income and the corporation is entitled to deduct depreciation on house No. 2. The record does not provide the Court with factual details from which it could find that Joseph was regularly engaged in any business in which the $800 paid to a patent lawyer was an ordinary and necessary expense. Decision will be entered under Rule 50. Footnotes
*. U.S. Government Securities or Certificates of Deposit↩
1. Petitioner concedes in his brief that the $450 is not deductible herein.↩
2. He mentions no lower figures.↩
3. It is not clear from the notice of deficiency how much he subtracted but the actual expenditures in 1962 and 1964 were far in excess of the above amounts.↩