**BROWN & WILLIAMSON TOBACCO CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 6789.**

United States District Court,
W. D. Kentucky,
Louisville Division.

March 9, 1973.

Robert L. Maddox, Ernest C. Pepples, Jr., DeBaun Bryant, Wyatt, Grafton & Sloss, David A. Schechter, Louisville, Ky., for plaintiff.

George J. Long, U. S. Atty., Stephen Csontos, Dept. of Justice, Tax Div., Washington, D. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

ALLEN, District Judge.

This tax refund action was tried before the Court without a jury on January 26, 1973. The Court has reviewed the evidence, which was transcribed, the deposition of Joseph Honeycutt, who died prior to trial, the stipulations of the parties, and the exhibits attached thereto, as well as the briefs.

This action is brought by plaintiff, Brown & Williamson Tobacco Corporation, a Delaware Corporation with its principal office in Louisville, Kentucky, seeking refunds of income taxes paid for the years 1963, 1965, 1966, 1967 and 1968, claims having been made to the District Director of Internal Revenue at Louisville, Kentucky, in a timely manner. Each claim was based on plaintiff's determination that the cost of construction of certain tobacco storage sheds incurred by it during the years in question entitled it to an investment credit, pursuant to Section 38 of the Internal Revenue Code of 1954, as amended, and related sections of the Code. The construction costs incurred by the plaintiff and the amounts of the investment credit claimed for each year are set out on pages 3 and 4 of the stipulation and made a part of this opinion as fully as if copied herein.

The litigation involves 14 tobacco storage sheds in Petersburg, Virginia, and 4 tobacco sheds in Louisville, Kentucky. Details and dates of the building of the sheds in question and photographs thereof are made a part of the record by stipulation and are incorporated into this findings of fact and conclusions of law.

All of the sheds in question both the 14 in Petersburg and the 4 in Louisville, were built and are being used by plaintiff solely for the storage and aging of its tobacco. Each shed is depreciable property and has an economic life in excess of eight (8) years. None of them is insulated. None has heating or plumbing facilities. Each is equipped with bug traps for infestation control, lighting and fire protection devices, including sprinklers. Each is constructed to provide for ventilation through the roof and through the side walls, either by means of a ventilation band or by means of louvers. The dimensions of each shed are approximately 150 feet in width, 154 feet in length and 22 feet in height. Each shed has two access doors with a connecting aisle to permit the loading and unloading of the hogsheads, and, except for the 4 Louisville sheds and the turkish tobacco shed, the floors are gravel or dirt with a 13½ foot wide aisle to allow for the movement of fork lift trucks. Several sheds are usually attached to one another, separated by a brick fire wall 12 inches thick. Unless otherwise described herein, the sides are constructed of overlapping corrugated

steel siding sheets, bolted together to form a continuous wall.

Tobacco is purchased by the plaintiff at auction and delivered to plaintiff's leaf processing plants, sometimes referred to as redrying plants. At the leaf processing plant, the tobacco is cleaned, stemmed, dried and placed in hogshead containers in preparation for an aging process. The hogshead containers are delivered to tobacco storage sheds, including the sheds which are the subject of this litigation. Each hogshead contains approximately 1,000 pounds of tobacco. There are approximately three to four thousand hogsheads stored in each shed. The tobacco is stored and aged in these sheds from 15 to 30 months, after which it is delivered to the manufacturing division for further processing into cigarettes and other tobacco products.

During the 15 to 30 months spent in the storage sheds, the tobacco ages. As the tobacco ages, it goes through a "sweating" process, which process accompanies the changes in seasons. It is by going through this sweating process that the tobacco becomes aged. The aging process is an essential and integral part of the entire process of manufacturing tobacco products.

The storage sheds in issue were specially designed and built to be used for the purpose of storing and aging the tobacco, and are being used by the plaintiff solely for this purpose. Employees enter the sheds only for the purposes of maintenance and/or to bring in and remove the hogsheads. No other work is done within the sheds. The sheds contain only storage space, and except for fork lift trucks, no equipment or machinery is located in the sheds.

The turkish leaf storage shed, Anchor Shed No. 38, built in 1968, is of a different design from the other sheds. Turkish tobacco is more susceptible to molding than other types, and therefore special precautions are necessary during the aging process. It is a one story, concrete block structure with permanent ventilation in the roof and an all-concrete floor. There are 32 plastic dome skylights permanently installed within the roof to admit light to prevent mold from forming on the turkish leaf tobacco. Also located in the roof are 4 powered fan ventilators circulating air to prevent molding on the tobacco. Turkish tobacco is not stored in hogsheads, but in bales of approximately 150 pounds each, with each bale being wrapped in burlap.

Louisville No. 10, consisting of four connected tobacco storage sheds, is also of a slightly different design from the other sheds. Due to requirements of the Louisville and Jefferson County Planning and Zoning Commission, the front of the facility, fronting on Algonquin Parkway in Louisville, Kentucky, has a brick veneer, and the sides are of concrete masonry, rather than corrugated steel. The sheds have concrete floors installed for the purpose of allowing greater movement of the fork lift trucks within the sheds. This greater movement allows for a significant decrease in labor costs to the plaintiff in the loading and unloading of the hogsheads.

As each hogshead is filled it is tagged with the following information: crop year, type of tobacco, grade of tobacco, a process number, the processing date and the weight of tobacco in the hogsheads. The plaintiff attempts to keep different types and different grades of tobacco in each shed so as to minimize the risk of loss from a fire or other similar disaster.

The plaintiff uses all of the tobacco stored in the sheds for its own tobacco products, and none of the tobacco is sold to other manufacturers.

Eight sheds in Petersburg and three in Louisville, which are not the subject of an investment credit claim, were originally constructed and used for the purpose of storing tobacco but have since been converted to the storage of manufacturing supplies. Details of the original construction dates, conversion dates and cost of conversion are listed in Exhibit 15 which is made a part hereof, as

well as the photographs thereof contained in Exhibit 17.

Paragraphs 17 and 18 of the stipulation refer to Louisville No. 3 and Louisville No. 5, which consist of a total of 7 storage sheds originally constructed for the purpose of storing tobacco, but which have been converted for use to a manufacturing facility and a heated supply warehouse respectively. The total conversion cost of Louisville No. 3 was $1,313,959 and of Louisville No. 5 was $401,775.

In addition to the facts contained in the stipulation, the testimony given at the trial indicate that the Louisville Public Warehouse Company, which is engaged in the general storage of goods, has converted 10 tobacco warehouses located in Louisville from their use as a storage facility for tobacco to a storage facility for general merchandise goods, at an approximate price of 81 cents per square foot. These conversions took place between 1950 and 1958, and Mr. Marcus C. Stuart, Jr., an executive of the Louisville Public Warehouse Company, estimated that it would have required between $3.50 and $5.00 per square foot to have built new buildings at that time. He estimates that now the cost of conversion would be at least twice as much as it was then, and also that the cost of building new construction would almost double.

Mr. Stuart was of the opinion that even without heating the tobacco facilities, they could have been used for general merchandise business, provided a concrete floor were installed. He modified his original statement in this respect and said that such a building would be useable for a limited number of things (pp. 56 and 57 of the Transcript).

Other evidence established at the time indicates that tobacco storage facilities can be converted to tobacco manufacturing purposes or to the storage of equipment, but that if this is done, it is much more preferable to install heat, toilet facilities and a sprinkler system and to make the building airtight. (Testimony of Mr. John D. Hancock, a Project Engineer with Brown & Williamson, p. 26 Tr.). Mr. Hancock also indicated that if plaintiff should need additional storage space for its manufacturing supplies, there would be ample space available in the older tobacco sheds owned by the plaintiff, which are not the subject of claim for refund. The same type of testimony was offered by Mr. Paul Howard Lamb, Branch Engineer in Petersburg for plaintiff (p. 66 Tr.) His testimony further established that all of the manufacturing supply space now used by plaintiff in Petersburg was originally used for tobacco storage.

The controversy between the parties focuses on the meaning of Section 48 of the Internal Revenue Code of 1954, and its application to the particular facts involved in this litigation. In order for the plaintiff to qualify for the investment credit, the property must conform to the definition of Section 38 "Property", as provided in Section 48, which states in part:

"(a) Section 38 Property.—

(1) In general.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction * * *, or

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i) or

\* \* \* \* \* \*

Such term includes only property with respect to which depreciation * * * is allowable and having a useful life * * * of 4 years or more."

Narrowing the question further, the parties have agreed that the basic controversy is whether or not the tobacco storage sheds in question are storage

facilities as defined in Section 48 or whether they are buildings and their structural components.

The Commissioner of Internal Revenue has promulgated Section 1.48–1(e) (1), Income Tax Regulations, which states in part:

"(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term 'building' generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, * * *. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) an enclosure which is so closely combined with the machinery or equipment which it supports, houses, or serves that it must be replaced, retired, or abandoned contemporaneously with such machinery or equipment, and which is depreciated over the life of such machinery or equipment. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, coke ovens, brick kilns, and coal tipples."

Again, in Revenue Ruling 66–89, the Commissioner has attempted to interpret the term "storage facilities" and "buildings":

"(5) *Storage facilities.* If property (other than a building and its structural components) is a storage facility used in farming such as the cultivation of the soil or the raising of livestock, and if it cannot be reasonably adapted to other uses, it qualifies as 'other tangible property' within the meaning of section 48(a)(1) of the Code, regardless of whether it is a temporary or a permanent facility. Typical storage facilities on farms include grain storage bins, corn cribs and silos. These are all to be distinguished from farm buildings which do not qualify as section 38 property, such as barns, stables, poultry houses and warehouses. All of these contain space within which the farmer works and carries on his farming activities and are ineligible for the credit because they fall within the definition of the term 'building.' A storage facility, as above illustrated, provides the farmer only storage space but not working space."

In Central Citrus Company v. Commissioner, 58 T.C. 365, the Tax Court held, after quoting the above provisions, that in determining whether a structure is a building or a storage facility for the purposes of the statute, the function or use test is considered to be the determining factor; that is, the facility may not be reasonably adaptable to other uses and it must provide only storage space, not working space.

The second part of that test gives this Court little concern, since the only work performed by the plaintiff with reference to the storage space is the bringing in and out of the tobacco hogsheads and their placement in the racks created for them and their removal therefrom. However, the first factor, that of reasonable adaptability, gives the Court some pause, inasmuch as it has been demonstrated that tobacco storage sheds may be converted to tobacco manufacturing supply warehouses or to tobacco manufacturing purposes, although at considerable economic cost to plaintiff. Unfortunately, the Tax Court did not see fit to explore further the question of what is meant by reasonable adaptability.

The cases which have interpreted the meaning of the words "buildings" and "storage facilities", as used in the investment credit sections, while not completely decisive of the question raised here, have led the court to the decision that the taxpayer is entitled to recover. In Central Citrus Company v. Commissioner, supra, it was held that where the

taxpayer erected, as part of his plant, processing compartments commonly referred to as "sweet rooms", where fruit while stored was subjected to various controlled atmospheric conditions so as to govern its quality prior to packaging, these sweet rooms constituted storage facilities within the meaning of the Internal Revenue Act. The sweet rooms were of a permanent construction and subject to removal, though such a process would be difficult, as they were anchored by studs into the concrete. The only equipment contained in the sweet rooms were the fixtures which control the temperature, humidity, gas content and air movement therein.

The Tax Court held that the sole function of these rooms was to condition and prepare the stored fruits for packaging and, except for possible conversion to cold storage facilities, they were not reasonably susceptible to any other use, and that the taxpayer contemplated no other use for them. In reaching its decision, the Tax Court relied heavily upon Robert E. Catron, 50 T.C. 306 (1968). In *Catron*, the taxpayers were engaged as partners in an apple farming venture. They built a metal quonset-type structure for use in the storing, selection and packaging of apples. The quonset-type structure is marketed as the "Behlen Curvet" and is specifically intended for agricultural uses, and comes in various lengths and widths.

The taxpayer used one-third of the quonset-type structure as a separate cold storage area, divided by a partition from the rest of the interior area, and is refrigerated and insulated. The court described it as, in effect, a room-size refrigerator suitable only for storage uses. The court held that the taxpayers were entitled to a credit for that portion of the building used for the refrigeration and storage of fruit. In reaching this decision, the Tax Court relied, to some extent, upon Revenue Ruling 66–89, 1966–1 C.B. 7, 8–9, which is set out on page 1287 of this opinion.

As noted by the Tax Court, that Ruling focuses upon the purpose or use of the space furnished by a structure. The Tax Court went on to hold that the cold storage refrigerated structure provided only storage space and not working space, and was a specialized facility for the cold storage of apples. It had no other function, and the chilly temperatures which prevailed would limit its adaptability.

This Court is in concurrence with the reasoning of the Tax Court, on page 316, to the effect that the placing in storage of a commodity by men using fork lifts does not require a conclusion that the storage facility itself furnishes working space and, therefore, loses its qualifications under the Tax Code. As the court states, these activities are incidental to the qualifying storage purposes and functions, and do not provide general working space.

In Olson v. Commissioner, [Dec. 30,-387 (M)], TC Memo. 1970–296, plaintiffs constructed two quonset-type structures for the purpose of storing grains. Ninety percent of the year, the buildings were used for this purpose, but at various time they have been used to store seed, fertilizer and certain farm equipment. The Tax Court reached the conclusion that these buildings did not qualify for the storage facility credit since they were available for multiple functional uses.

While the question is not free from doubt, since there have been no district court or appellate court cases dealing with the question involved here, the Court reaches the conclusion that the facilities used by the taxpayer are not reasonably adaptable for purposes other than for storage of tobacco, and that, therefore, taxpayer is entitled to recover its taxes paid, pursuant to the determination by the defendant that these structures were buildings rather than storage facilities.

Plaintiff shall tender to the Court a final judgment for signature and entry.