PABST BREWING COMPANY, a foreign corporation, Plaintiff-Respondent,

v.

CITY OF MILWAUKEE, a municipal corporation, Defendant and Co-Appellant,

Wisconsin DEPARTMENT OF REVENUE, Defendant-Appellant.†

Court of Appeals

*No. 84–2023. Submitted on briefs May 7, 1985.—Decided July 15, 1985*
(Also reported in 373 N.W.2d 680.)

† Petition to review denied.

438

For defendant-appellant Wisconsin Department of Revenue the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, with *John C. Murphy,* assistant attorney general, of counsel, of Madison.

For the defendant and co-appellant City of Milwaukee the cause was submitted on the briefs of *Grant F. Langley,* city attorney, with *Patrick B. McDonnell, Milton Emmerson,* and *Scott G. Thomas,* assistant city attorneys, of counsel, of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *Michael, Best & Friedrich,* with *Rickard T. O'Neil, Jerome H. Kringel,* and *John C. Lapinski* of counsel, of Milwaukee.

Before Wedemeyer, P.J., Moser and Sullivan, JJ.

SULLIVAN, J. The City of Milwaukee (City) and the Wisconsin Department of Revenue (Department) appeal from a judgment determining that certain structures owned by Pabst Brewing Company (Pabst) and used in the brewing process were exempt from taxation because they were machinery or equipment, and not buildings or building components, within the meaning of sec. 70.11(27), Stats. We affirm the trial court's determination that the structures are exempt and that Pabst is entitled to a refund of the taxes paid between 1974 and 1980. However, we reverse that portion of the judgment extending Pabst's entitlement to a tax refund to years beyond those stipulated by the parties as being in issue. We do not reach the issue whether Pabst paid the subject taxes under protest; that issue was waived for failure to raise it at trial.

After execution of an extensive stipulation of facts, this case was tried to the court for one and one-half days in 1980. The trial was followed by the filing of extensive post-trial briefs. The trial court issued its findings of fact and conclusions of law in September of 1983. Stated briefly, the court determined that each disputed structure functioned as machinery in the production of beer and was thus exempt from property taxation under sec. 70.11(27), Stats. The court also concluded that Pabst was entitled to a refund of general property taxes paid with respect to the misclassified structures. In August of 1984 the court ordered that the order for judgment must include an order for refund of taxes paid, not only between 1973 and 1980, but also in 1981, 1982, and 1983. The order for judgment and judgment were entered on September 4, 1984. This appeal followed.

It was stipulated by the parties that the demands of quality control in brewing and modern mass production "have led to the design and construction of specialized

structures which are in every sense of the term 'custom-built' with particular beer-making functions in mind." The chief legal issue presented is whether certain of these structures are "buildings or building components" and not exclusively or directly used in the manufacture of beer, as the Department and City contend, or are, by their function in the beer-making process, not buildings but beer processing equipment exclusively and directly used in manufacturing beer, as Pabst contends and as the trial court held. This issue was briefed by the Department, with the City joining in its arguments. The City briefed the issues whether Pabst's failure to introduce evidence that it paid under protest bars its recovery and whether the trial court erred in ordering the refund of property taxes paid after 1980.

Four of the structures at issue here are associated with the malting process, and four are associated with the fermenting process. The structures at issue that are associated with malting are the barley bins (structures 36 and 24), the malt house (structure 25), and the head house portion of the malt bins (structure 16A). The structures associated with the fermenting process are cellars 1, 3, 5 and 6. All of the structures involved in the lawsuit are part of Pabst's manufacturing plant. Not involved in this case are Pabst's brew house (which is also part of its manufacturing plant), its offices and warehouse, and certain of its cellars that the Department conceded were exempt.

The malt bin portion of structure 16A is conceded to be exempt from property tax by virtue of this court's ruling on equivalent malt bins in *Ladish Malting Co. v. Department of Revenue,* 98 Wis. 2d 496, 297 N.W.2d 56 (Ct. App. 1980). However, the head house portion of the structure, which sits atop the malt bins, is in issue here. The Department also concedes exemption under

*Ladish* for Pabst's kiln, except for one wall that adjoins the malt house.

The structures in controversy function in the brewing process in the following manner. During the malting stage, the barley is cleaned and graded and then "rested," first in structure 36 and then in structure 24. "Resting" is a stage in which, under controlled temperature and humidity, the barley undergoes an organic change. The barley is next transferred to the malt house, structure 25. There, the barley is steeped in water and then placed in large germination compartments, where warm, moist air is directed over and through the barley. In this environment the barley germinates. At a prescribed phase in the germination, the barley is transferred to the kiln, which adjoins the malt house. The kiln generates a flow of hot, dry air over the barley, which is now called green malt. The flow of air dries the malt and halts germination. After kilning, the malt returns to structure 24, where it is cooled; and then it passes into the malt bins, structure 16A, for aging and blending. From the malt bins, the aged and blended malt is sent to the brew house, a structure not involved in this case. There, the malt undergoes a process called "mashing" which transforms it into a sweet liquor called "wort." The wort is then piped into tanks in the cellars, which are like giant refrigerators, where fermenting and aging take place. The end result is beer.

## I.

The principal question presented for review is whether the trial court correctly ruled that Pabst's grain bins, malt house, the head house portion of its malt bin, and certain cellars not conceded by the Department to be exempt were exempt from property tax under sec. 70.11

(27), Stats. because they were not buildings or building components and were exclusively and directly used in the manufacture of tangible personal property within the meaning of sec. 70.11(27). When the question on appeal is whether a statutory concept embraces a particular set of factual circumstances, the reviewing court is generally presented with a mixed question of fact and law. *See Nottelson v. DILHR,* 94 Wis. 2d 106, 115–16, 287 N.W.2d 763, 767–68 (1980). In this case the parties stipulated to the essential facts, *i.e.,* the various roles of the structures in the brewing process. Thus, we are faced only with the ultimate question of whether the facts, in the case of each structure, fulfill the statutory standards that would exempt the structures from property taxation. This is a question of law. *See Department of Revenue v. Bailey-Bohrman Steel Corp.,* 93 Wis. 2d 602, 606, 287 N.W.2d 715, 717 (1980). On questions of law, we do not defer to the trial court. *Id.* Where an administrative agency's expertise is significant to the determination, we will accord some weight to its decision, but it is not controlling. *Nottelson,* 94 Wis. 2d at 117, 287 N.W.2d at 768.

Section 70.11(27), Stats., exempts from property taxation "[m]anufacturing machinery and specific processing equipment, exclusively and directly used by a manufacturer in manufacturing tangible personal property." The section defines manufacturing machinery and specific processing equipment as

any combination of electrical, mechanical or chemical means, including special foundations therefor, designed to work together in the transformation of materials or substances into new articles or components, including parts therefor, regardless of ownership and regardless of attachment to real property. *This shall not be construed to include* materials, supplies, *buildings or building components* . . . . (Emphasis added.)

This section has been in effect since the 1974 tax assessment. *See* ch. 90, Laws of 1973.

■

A tax exemption statute is to be strictly construed against granting the exemption, and the burden of bringing the property in question within the terms of the exemption is on the taxpayer. *Ladish,* 98 Wis. 2d at 502, 297 N.W.2d at 58. An exemption statute need not be given the narrowest possible construction. "A strict but reasonable construction seems to be the pithy and popular statement of the rule." *Id.* (citations omitted).

In enacting sec. 70.11(27), Stats., the "legislature plainly intended to exempt manufacturing machinery and equipment exclusively used in transforming raw products into merchantable goods, while withholding the exemption from buildings and building components." *Ladish,* 98 Wis. 2d at 503, 297 N.W.2d at 58. Thus, we are primarily concerned with two concepts contained in sec. 70.11(27). We are concerned with whether the disputed property is "manufacturing machinery" "exclusively and directly" used in manufacturing tangible personal property and with whether the disputed property is a "building" or "building component."

■

In making these determinations we follow the "function or use" test adopted by this court in *Ladish,* 98 Wis. 2d at 506–11, 297 N.W.2d at 60–62, and by the supreme court in *Department of Revenue v. Greiling,* 112 Wis. 2d 602, 607, 334 N.W.2d 118, 121 (1983). In *Ladish* we held that Ladish Malting Company's attemperators, kilns and malt elevators were exempt from taxation under sec. 70.11(27), Stats., despite the fact that all of the structures had "walls, floors, and ceilings or roofs" and had a " 'building-like' appearance from the outside." *See* 98 Wis. 2d at 499, 297 N.W.2d at 57. We rejected the "physical appearance" test in favor of a functional analysis under which the central question is whether the structure is one " 'whose utility is principally and primarily a significantly contributive factor in the actual manufac-

ture or production of the product itself.' " *Id.* at 506, 297 N.W.2d at 60 (citation omitted). We concluded that each disputed structure was "designed [and used] to process raw materials into a final product, and for no other purpose." *Id.* at 510, 297 N.W.2d at 62.

Citing *Ladish,* the supreme court in *Greiling* adopted the "use or function" test. In *Greiling* the issue was whether a greenhouse was a "machine" exempt from the use tax under sec. 77.54(3), Stats. The supreme court decided that the functional characteristics of a greenhouse made it a machine for purposes of the use tax exemption: "[This greenhouse] cannot be viewed merely as a storage facility because it has an active function of creating and controlling an environment conducive to the production of floricultural crops. . . . On this record, it has no other purpose or function, nor could it be successfully adapted to another use." 112 Wis. 2d at 607, 334 N.W.2d at 121.

*Greiling* and *Ladish* make it clear that a structure's external appearance does not determine whether it is a building. Rather, the question is whether the structure is being used as a building in the taxpayer's hands. *Ladish,* 98 Wis. 2d at 506, 297 N.W.2d at 60 (citing *Brown-Forman Distillers Corp. v. United States,* 499 F.2d 1263, 1271 (Ct. Cl. 1974)). An emphasis on function elevates substance over form. *Ladish,* 98 Wis. 2d at 510, 297 N.W.2d at 62.

The question whether a structure is a building arises frequently under federal tax law in relation to the investment credit section of the Internal Revenue Code, which employs the phrase, "building and its structural components." *See* I.R.C. sec. 48(a)(1)(B). We note that when sec. 70.11(27), Stats., was drafted, representatives of industry asked the legislature to substitute the more restrictive phrase "buildings or building components" for the originally drafted phrase "structures or fixtures"

in order to obtain greater conformity with I.R.C. sec. 48(a)(1)(B) and the body of case law that had developed around it. *See Ladish,* 98 Wis. 2d at 504–05, 297 N.W.2d at 59. The federal regulations define "building" as "any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space." 26 C.F.R. sec. 1.48–1(e)(1) (1984). The term does not include "a structure which is essentially an item of machinery or equipment" and "does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples." *Id.*

A similar definition, referred to in *Ladish,* 98 Wis. 2d at 509, 297 N.W.2d at 61, was that of the New Jersey Supreme Court in *Public Service Electric & Gas Co. v. Township of Woodbridge,* 375 A.2d 1165, 1167 (N.J. 1977) : "A building in the usual and ordinary acceptation of the word is a structure designed and suitable for habitation or sheltering human beings and animals, sheltering or storing property, or for use and occupation for trade or manufacture."

Thus, in asking whether a structure functions as a building in the taxpayer's hands, we must first ask whether the structure was designed, and is principally employed, to provide shelter or housing to humans or animals; storage for property; or working, office, parking, sales, or display space for trade or industry. The Department would have us conclude, under the instant facts, that the structures at issue house people and machines and provide industrial working space and, thus, are buildings. The Department also urges that, whatever label one affixes to the structures, they are not "exclusively and directly used in the manufacture of tangible personal property."

The phrase "exclusively used" is defined for tax exemption purposes in Black's Law Dictionary 507 (5th ed. 1979) as "[having] reference to primary and inherent [use] as over against a mere secondary and incidental use." While neither *Ladish* nor *Greiling* defines "exclusive and direct use," their adoption of the function or use test implies that "exclusively" does not have to mean "solely" or "purely" but rather "principally and primarily." Under the function or use test, the question asked is whether the structure's utility is "principally and primarily" a significant contributing factor in the product's manufacture. *Ladish,* 98 Wis. 2d at 506, 297 N.W.2d at 60. Incidental use of manufacturing property for a nonexempt purpose does not violate the exclusivity requirement of sec. 70.11(27), Stats. *Manitowoc Co. v. City of Sturgeon Bay,* 122 Wis. 2d 406, 414, 362 N.W.2d 432, 437 (Ct. App. 1984).

Similarly, the phrase "directly used" must be defined without resort to hypertechnicality. A degree of passivity in a structure, *e.g.,* the motionless character of its walls, is not an absolute bar to its functioning directly as a machine. Chemical action within a structure may be as legitimate, for these purposes, as mechanical action. *See Ladish,* 98 Wis. 2d at 507–08, 297 N.W.2d at 61.

Thus, we do not deem it inconsistent with the rule of strict construction to reject an over-literal approach to the question whether a structure constitutes a building or building component or machinery/equipment exclusively and directly used in the manufacture of property. *See Honeywell Information Systems, Inc. v. County of Sonoma,* 118 Cal. Rptr. 422, 425 (Ct. App. 1974) (phrase "exclusively used," in context of property tax exemption for property exclusively used for public schools, construed to allow incidental other uses necessary to and in

furtherance of primary use). Our supreme court has avoided hypertechnical applications of property tax exemption statutes. *See, e.g., Family Hospital Nursing Home v. City of Milwaukee,* 78 Wis. 2d 312, 320–23, 254 N.W.2d 268, 273–75 (1977) (phrase "used exclusively," in context of tax exemption for property used exclusively for benevolent purposes, construed to allow benevolent association to charge fees to nursing home patients, to reimburse directors for expenses, and to claim exemption for post-construction period when nursing home was being readied for patient occupancy). We now turn to an analysis of each structure at issue.

## THE BARLEY BINS

The barley bins in structures 36 and 24 are separate physical entities for historical reasons not germane to this case; the two barley bins perform a common function in the beer making process. Both bins "rest" or maintain the barley kernels at controlled temperatures and humidity to prevent premature germination. Properly timed and uniform germination is essential to large scale malting, and this uniform germination could not take place without resting the barley. Contrary to the Department's assertion, the function of the barley bins is not the passive storage of barley kernels. The barley actually undergoes an organic change when it rests, and the parties so stipulated:

For reasons which have not been scientifically pinpointed, freshly harvested, "country-run" barley goes through a period of "dormancy" following harvesting, during which time individual barley kernels will germinate at uneven, non-uniform rates or not at all. The period of dormancy varies for different barley strains, but is generally around six weeks. Since large scale malting requires even, uniform barley germination, the barley must be permitted to "rest" until the dormancy period

"breaks" in order to reach good germinating energy and capacity for malting.

It appears to us to be beyond controversy that the use of the barley bins "is committed to a more ambitious purpose" than mere storage. *See Ladish,* 98 Wis. 2d at 503, 297 N.W.2d at 59.

Pabst cites a federal court case concerning the tax status, for investment credit purposes, of tobacco sheds used to age tobacco. In *Brown & Williamson Tobacco Corp. v. United States,* 369 F. Supp. 1283 (W.D. Ky. 1973), *aff'd per curiam,* 491 F.2d 1258 (6th Cir. 1974), the district court noted that the aging process was an essential and integral part of the manufacture of tobacco products and that the sheds in issue were specially designed and built for fostering this organic process. *Id.,* 369 F. Supp. at 1285. The court concluded that the sheds were not "buildings," but storage facilities entitled to the investment credit. *Id.* at 1288.

Insofar as the barley bins perform an integral function in the production of malt, we must conclude that they are "directly used" in the brewing process. They are also "exclusively" so used since their use is devoted entirely to maintaining proper temperature and humidity ranges under different weather conditions for the resting of barley. The bins are used for no other purpose. The bins were designed and constructed to foster an organic process and not merely to store grain. As such, they do not function as buildings but, rather, as processing equipment. Just as in *Greiling,* these structures create "the artificial environment necessary to produce" a product and, as such, can be considered machines. 112 Wis. 2d at 606, 334 N.W.2d at 120.

We conclude that the principal utility of Pabst's barley bins is a significant factor in the production of beer. We thus hold that the bins are exempt from property tax under sec. 70.11 (27), Stats.

## THE MALT HOUSE

The malt house, structure 25, has two main parts, the germinating room and the malt kiln. The Department concedes exemption for three of the four kiln walls. The Department acknowledges, with the exception of the fourth wall, that the kiln is equivalent to the kiln held tax-exempt in *Ladish*. The Department's refusal to exempt the fourth wall of the kiln rests on its refusal to exempt the malt house as a whole. It contends that the remainder of the malt house (the germinating room) is a building or building component.

The function of the malt house is to convert barley into malt on a large scale. The house has six stories, multiple rooms, stairs, an elevator, and office space. The principal parts of the germinating room portion of the malt house are the steep tank area, the germination compartment area, and the spray deck. The germinating room's steep tanks are filled with heated, aerated water into which barley is submerged to begin the germination process. The barley is conveyed to germination compartments after it has been steeped. The compartments are large vats or troughs in which the temperature, moisture, and carbon dioxide content are controlled. The steep tanks and germination compartments are themselves exempt from taxation.

A complex air circulation and attemperation system is built into the malt house. Through a network of air shafts, fresh air is directed in and through the grain beds, and foul air out, in such a way as to achieve the transformation of the barley into green malt. The very walls, floors, and roof of the structure are part of the network of fresh and foul air shafts. The process of attemperating the fresh air starts in the "spray deck" on the top floor of the malt house, where outside air is conditioned and humidified. From there, the air is sent through openings to flow into the grain compartments

throughout the malt house. Twenty-four-hour monitoring of the temperature levels in each germination compartment is maintained by Pabst employees, who make the necessary air flow adjustments to keep the temperature within a specific range.

The Department stipulated before trial that the spray deck was a giant air conditioner-humidifier; the Department asserts, however, that the malt house as a whole is not principally or primarily a giant air conditioner-humidifier, as were the attemperators in *Ladish*. *See* 98 Wis. 2d at 499–500, 297 N.W.2d at 57. The Department contends that the malt house is no different from any ordinary industrial building containing an air circulation system to get rid of smoke, dust or smells generated by the manufacturing activities carried on within. The malt house, argues the Department, is simply housing for the machinery, equipment, and employees who facilitate the conversion of barley into malt.

We are persuaded otherwise. Again, under a functional analysis, we cannot say that the malt house was designed, and is principally employed, merely to provide shelter for equipment, storage for grain, and working space for employees.

[8]

We first reject the notion that the malt house is a shelter for employees to work. Granted, there are control room areas where employees monitor equipment function, and there is an office for the supervisor of malt house employees. However, it appears that the employee activity in the malt house for purposes of temperature monitoring, operation, and maintenance is no different in type or degree from that considered incidental in *Ladish*. *See id.* at 501, 297 N.W.2d at 58. Employee activity in the malt house is generally confined to the machinery hall, which contains levers for operating the kiln floors, monitoring and other equipment for the germinating room and kiln, the supervisor's office, the

elevator, and the stairwell. The elevator and stairwell provide access to the different levels to check the machinery. Outside of the machinery hall, there is little employee involvement in the malt house; the kiln is too hot and the germinating room too humid. The germinating room is monitored on an almost totally automated basis. Indeed, as in *Ladish,* human entry may be gained only through an airlock, due to vast differences in air pressure. *See id.* The fact that some human activity, incidental to a structure's function, is carried on within the structure, does not mean that the structure provides general working space. *See Brown & Williamson Tobacco,* 369 F. Supp. at 1288. We conclude that the working space provided in the malt house is merely incidental to its principal function or use. *See Ladish,* 98 Wis. 2d at 506, 297 N.W.2d at 60.

We likewise reject the assertion that the malt house is merely a shelter for equipment or a storage place for grain. The grain undergoes an organic transformation in the malt house, just as in the barley bins. Pabst presented uncontradicted expert testimony to the effect that each area of the malt house is the large-scale functional equivalent of small-scale machinery counterparts in Pabst's small pilot plant. The walls, floors, and roof of the malt house are integral to its function insofar as they keep in the attempered air.

The principal and primary function of the germinating room portion of the malt house is to create an artificial environment conducive to the transformation of barley into malt. In that sense, it is analogous to the greenhouse in *Greiling.* *See* 112 Wis. 2d at 606–07, 334 N.W.2d at 120–21.

The Department contends that exempting the Pabst malt house would invalidate the "buildings or building components" exception to the exemption provided in sec. 70.11(27), Stats., by placing "untold numbers" of custom-

built factory buildings "completely beyond taxation." We can only determine whether the structures in the case before us are exempt under the statute as it is written. This court does not make tax policy.

We conclude that the entire malt house functions as machinery or equipment because its principal utility is a significant factor in the production of beer. Accordingly, we hold that the entire malt house is exempt from taxation under sec. 70.11(27), Stats.

## THE HEAD HOUSE

The head house, which sits atop the malt bins, structure 16A, was described in the Stipulation of Facts as a "56-feet tall structure . . . of poured concrete" whose "sole purpose . . . is to support cleaning and transferring equipment through which the malt must pass on its journey from the Malt House into the bins and from the bins to the Brew House." Although the Department is now exempting all of the malt bin portion of structure 16A, it argues that the head house portion of the structure may not be exempted because it is a building. The Department asserts that the head house encloses and protects cleaning and conveying equipment from the elements and, as such, is merely a shelter for property.

According to the Stipulation of Facts, structure 16A was designed and is used "to protect the malt from moisture and extreme variations of temperature and humidity and to age and blend the malt on a large scale." To get to the malt bins for aging and blending, the malt must be conveyed from the malt house. After aging and blending, the malt must be conveyed from the malt bins to the brew house for mashing. The cleaning and transferring equipment that takes the malt in and out of the malt bins is contained in the head house. The cleaning and transferring equipment is itself exempt.

It is undisputed that the head house is a "part" of structure 16A and that structure 16A, except for the head house, is exempt from taxation under *Ladish*, which held that malt elevators (equivalent to the instant malt bins) were exempt. If the major portion of structure 16A is conceded to be machinery or equipment used exclusively and directly in manufacturing, we must conclude that the portion of the structure containing equipment incidental to that structure's function is also exempt. Hence, we hold that structure 16A, in its entirety, is exempt from taxation because it is machinery or equipment exclusively and directly used in the production of beer.

## THE CELLARS

After leaving the malt bins (structure 16A), the aged and blended malt goes to the brew house for mashing. There, it becomes a sweet liquor called wort. From the brew house the wort is piped to tanks in cellars for fermentation and aging. The Department argues that cellars 1, 3, 5, and 6 do not themselves perform a manufacturing function but rather create a workplace for persons to operate already-exempted equipment to make beer. Pabst responds that the cellars function as refrigerators and, thus, as machines.

The parties stipulated that fermentation is a carefully temperature-controlled process consisting of two stages. In the first, or primary, stage the wort is combined with yeast and subjected to a temperature of 50°–57°F for seven to nine days. Under these conditions, the yeast converts the sugar in the wort into alcohol and carbon dioxide. In the second stage of fermentation, the beer is transferred to other tanks for separation of most of the yeast from the wort and subjection to a temperature of 32°F. The yeast cells remaining in the wort become

lethargic at that temperature, and fermentation continues at a substantially diminished rate for several weeks. As the wort gains in alcohol and carbon dioxide, it develops the taste found in commercial beer.

In earlier times, wort could be fermented and aged only during cool periods of the year or in deep subterranean cellars. Modern-day cellars are giant, aboveground structures that permit fermentation to take place the year round.

The cellars vary somewhat in construction, but all serve the same purpose. The parties stipulated that the cellars' purpose is "to support and envelop the tanks of the wort-yeast mixture in the chilled, temperature controlled environment essential for fermentation and aging." The parties also stipulated that the "cellars are all in effect huge walk-in refrigerators and were designed and are used for no purpose other than fermentation and aging of beer."

Cellar 5, the oldest cellar, is essentialy a huge block of poured concrete in which an arrany of hollow chambers was formed as the concrete was being poured. The resulting structure resembles a honey comb. The parties stipulated to the following description:

[S]ome of the chambers are shaped and used to hold fermenting wort. The tops, bottoms, and sides of these fermenting chambers consist of the very same concrete of which the structure of cellar 5 itself is made. Other chambers run above, below and in between the fermenting chambers and form an interconnected network of ducts through which refrigerated air is circulated to cool the fermenting wort. The walls of the ducts themselves are the opposite face of the walls of the fermenting chambers. Thus, the ducts themselves, like the fermenting chambers, are formed of the very concrete of which Cellar 5 is made.

The stipulation goes on to state that "[t]here is absolutely no purpose for which Cellar 5 could be used, other

than the fermentation or aging of beer, without substantial alterations and improvements."

Cellars 1, 3, and 6 are constructed differently. They all have an interconnected network of columns and beams forming a gallery of horizontally spaced and vertically stacked cubicles with a single fermentation tank occupying each cubicle. Each tank rests on supports affixed directly to the beams and fully occupies a complete bay area or cubicle. The weight of each tank is entirely supported by the horizontal beam on which it rests. The beam is then connected to the column nearest the tank. The parties stipulated that "[c]ellars 1, 3 and 6 are custom designed for and used only for the process of fermenting and aging beer" and that "[b]ecause of their custom designed nature, they could be converted to another use only at great expense and only after making substantial changes to the existing structural arrangement."

The Department's concessions that the cellars could be used for no other purpose than fermentation and aging of beer without substantial alterations and improvements is in flat contradiction to its assertion that the cellars' sole purpose is to create employee work areas. The record indicates that the presence of employees in the cellars is occasional and is limited mainly to connecting or disconnecting hoses and taking wort samples and temperatures. Except for narrow drainage aisles, there is very little space for employees even to walk. Further, the temperatures are too low, and the air too damp, for regular human occupation. Again, this employee activity is comparable in type and degree to that considered incidental in *Ladish*, 98 Wis. 2d at 501, 297 N.W.2d at 58.

In *Brown-Forman*, 499 F.2d at 1268–73, certain large whiskey aging structures were held not to be building components excluded from qualifying for the investment tax credit despite the fact that employees regularly entered them to load and unload barrels, search for and

repair leaks, and check for temperatures and humidity. A case even more closely analogous to the one before us is *Adolph Coors Co. v. Commissioner,* 27 T.C.M. 1351 (1968). At issue in *Coors* were cellars virtually identical to the Pabst cellars; they were described as shells with steel supports to enclose and support very large beer tanks and related equipment. *Id.* at 1357. Employees entered the cellars to check temperatures, pressures, and cooling systems; take beer samples; and fill, empty, and clean the tanks. The court ruled that the cellars were not buildings for purposes of the investment tax credit. *Id.* at 1358.

The Department also argues that the cellars do no more than shelter the large tanks within and that, thus, they do not directly transform a substance into tangible personal property. The framing and walls of the cellars, it is true, play a passive role in the fermentation process, but so do the walls and framing of any refrigerator. The cellar walls hold in the air that cools the tanks and permits fermentation and aging; the cellar framing holds the tanks in place. In *Niagara Mohawk Power Corp. v. Wanamaker,* 144 N.Y.S.2d 458 (App. Div. 1955), *aff'd,* 157 N.Y.S.2d 972 (1956), in the context of a sales and use tax exemption for property directly and exclusively used in the production of tangible personal property, the court said: "[A]ctivity is not the test of directness. The walls of the boiler have a 'passive' function in one sense. The important thing is that all parts of the plant contribute, continuously and vitally, to production, and they are all integrated and harmonized." *Id.* at 462. The passive nature of the cellar walls and framing must not be allowed to obscure the fact that their sole reason for existence is to create the conditions that permit the fermentation of beer on a mass-production scale.

We conclude that cellars 1, 3, 5, and 6 are used principally and directly to process wort into beer; thus, they

function as machines. The cellars were not designed, and are not primarily used, to provide mere shelter, storage, or working space; thus, they are not buildings or building components. Because the cellars are machinery that primarily, directly, and significantly contributes to the manufacture of tangible personal property, they are exempt from property taxation under sec. 70.11(27), Stats.

## II.

We now turn to the issues surrounding Pabst's entitlement to a refund of property taxes paid on the disputed structures. We first dispose of the City's charge that Pabst is entitled to no refund because it failed to prove that it had paid any of the taxes on the disputed property involuntarily or under protest.

The City did not raise the issue whether Pabst paid under protest at any time in the proceedings before the trial court. The issue was neither raised in pretrial briefs, nor during the trial, nor in post-trial briefs. The parties stipulated that the issues to be decided by the trial court were whether the structures were buildings or building components and whether the property was exclusively and directly used in manufacturing.

The trial court noted in its findings of fact and conclusions of law that "none of the major defenses raised in *Heilman* [sic] *Brewing Co. v. City of LaCrosse*, 105 Wis. 2d 152, 312 N.W.2d 875 [Ct. App. 1981], was raised in this action and are accordingly not here present." The defenses in *Heileman* to which the trial court alluded included payment under protest. *See id.* at 155, 312 N.W.2d at 876.

As a general rule, an appellate court will not consider issues raised for the first time on appeal. *County of Columbia v. Bylewski*, 94 Wis. 2d 153, 171, 288 N.W.2d 129, 138–39 (1980). As it appears that the payment

under protest question was not considered a genuine issue until after the City lost the case, we deem the issue waived.

Both the City and the Department complain on appeal that the trial court erred in including in its judgment the years 1981, 1982, and 1983. The parties stipulated that the only years to be covered by the judgment were 1974 through 1980. The Department briefs the issue whether Pabst was entitled to a declaratory judgment on the tax status of the subject property for years after 1980, and the City briefs the issue whether Pabst was entitled to a judgment ordering a refund for years after 1980. The Department is not a defendant in Pabst's claim for a refund.

This case dates back to 1975 when Pabst filed a complaint seeking a declaratory judgment on the tax status of certain structures for the year 1974. The complaint was amended and expanded in 1976 to seek relief for 1974 and subsequent years. The parties subsequently entered into several stipulations that included agreements on the years to be covered by the judgment sought. The last of these stipulations was entered into in February, 1980, immediately prior to an evidentiary hearing. This final stipulation provided that the years to be covered by the declaratory judgment were 1974 through 1980. In the final judgment entered in 1984 (four years after trial), the court ruled that the judgment also included the years 1981 through 1983.

The trial court's declaration as to the tax status of the disputed property for years subsequent to the years in issue at trial was improper because "the record could contain no evidence to support" the judgment. *See Family Hospital Nursing Home,* 78 Wis. 2d at 327, 254 N.W.2d at 276. The tax exemption for manufacturing machinery is based on property use, which must be defer-

mined yearly. *Manitowoc Co.*, 122 Wis. 2d at 413, 362 N.W.2d at 436.

Accordingly, we reverse that portion of the judgment extending the court's ruling to the years 1981, 1982, and 1983. In all other respects, the judgment is affirmed.

*By the Court.*—Judgment and order affirmed in part and reversed in part.