LADISH MALTING Co., a Wisconsin corporation, Plaintiff-Respondent,

v.

Wisconsin DEPARTMENT OF REVENUE, Defendant-Appellant,

TOWN OF AZTALAN, Defendant.†

Court of Appeals

*Nos. 79–495, 79–496, 79–497, 79–498. Argued August 21, 1980.— Decided August 21, 1980.* (Also reported in 297 N.W.2d 56.)

† Petition to review denied.

For the defendant-appellant there were briefs by *Bronson C. La Follette,* attorney general, and *E. Weston Wood,* assistant attorney general, and oral argument by *John C. Murphy,* assistant attorney general.

For the plaintiff-respondent there was a brief by *John A. Hazelwood* and *Elwin J. Zarwell, Quarles & Brady* of Milwaukee, and oral argument by *John A. Hazelwood.*

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

BABLITCH, J.   This is an appeal by the Wisconsin Department of Revenue (department) from a judgment determining that certain property used by the Ladish Malting Company (taxpayer) in the manufacture of malt was exempt from property taxes under sec. 70.11(27), Stats. The taxpayer brought four separate actions seeking declaratory judgment and a refund of taxes paid to the defendant Town of Aztalan from 1974 through 1977 based on the department's assessments. The town is not a party to this appeal. The actions were heard together on the basis of a detailed stipulation of facts, disposed of by a single judgment ordering a total refund of $375,125, and consolidated on appeal. We affirm.

Section 70.11(27), Stats., was created by ch. 90, Laws of 1973, as a part of the budget bill. The subsection embodies the so-called "M & E" exemption from property taxation of "[m]anufacturing machinery and specific processing equipment, exclusively and directly used by a manufacturer in manufacturing tangible personal property." The exempted property is defined by the statute as:

any combination of electrical, mechanical or chemical means, including special foundations therefor, designed to work together in the transformation of materials or substances into new articles or components, including parts therefor, regardless of ownership and regardless of attachment to real property. *This shall not be construed to include materials, supplies, buildings or building components;* nor shall it include equipment, tools or implements used to service or maintain manufacturing machinery or equipment. [Emphasis supplied.]

The disputed items of property are attemporators, kilns, and malt elevators.  It is undisputed that each of these items is used exclusively and directly by the taxpayer in the transformation of barley into malt.  The

parties stipulate that "but for the building-building component exception" to the M & E exemption, the property would not be taxable.

The department's main contention is that none of the properties is a machine because each of them is a "building" within the meaning of the italicized exclusion from the definition of machinery and equipment set forth above. In its reply brief on appeal, however, it also contends that the exemption "applies only to *machinery which* is not a building or building component."

The department thereby proffers, though it does not press, two inconsistent views of the statute. Under its first contention machinery and equipment on the one hand, and buildings or building components on the other, are mutually exclusive categories of property. Under its second contention they are not. Because we agree with the trial court's determination that the structures in question are machinery or equipment and are not buildings within the contemplation of the statute, we need not address the question whether it is possible for one structure to fit both categories simultaneously nor whether any such structure would be entitled to the statutory exemption.

The structures involved in this case share certain characteristics. All have walls, floors, and ceilings or roofs. At least the kiln and the attemporator have foundations. All are very large structures comporting, as the trial court noted, with the magnitude of the taxpayer's operations. All have a "building-like" appearance from the outside. Each performs an independent, essential function in the manufacturing process by which malt meeting the various specifications of the taxpayer's customers is made.

The parties agree that an attemporator is similar to a "giant air conditioner-humidifier." Its function is to maintain the exact temperature and humidity conditions required to induce the germination of barley kernels—

the first step of the malt-making procedure—within "growing compartments" inside the taxpayer's malt house.[1] Each attemporator consists of a fan and three compartments attached to a growing compartment. The fan forces air to circulate past water sprays in the compartments of the attemporator, where it is saturated to 100 percent humidity. The air is then forced into the growing compartments. The parties agree that no part of the attemperator's walls, ceiling, or floor has any value solely on its own, and that the same are designed to channel the moisturized air through the attemporator and into the growing compartments. The outer shells of the taxpayer's attemporators, which are custom made, are composed of one-half inch of transite (a corrugated asbestos and concrete material), the same as the outer shell of the malt houses to which they are attached. Commercially produced attemporators made of stainless steel are available on the market. They perform exactly the same function as the taxpayer's attemporators and do not look like buildings.

After germination has occurred to the desired degree, the resultant "green malt" is transferred to kilns, which are self-supported brick wall enclosures, for heating and drying. Huge fans at the top of the structure draw heated air up through three tiers of trays with perforated bottoms upon which the grain is spread. The trays have louvers which are opened manually from time to time to allow the grain at the higher levels to fall to the tray beneath at the appropriate stage in the drying process. The temperature inside the kiln may reach as high as 220 degrees Fahrenheit, depending on the type of malt being produced.

After drying is completed to the required specifications, the grain is placed in malt elevators for aging and blending according to the individual customer's order. Aging

[1] The taxable status of the malt house itself is not at issue on this appeal.

is an organic process during which the moisture content in the kernels of green malt stabilize at a uniform level from the center of each kernel to its outer shell. The taxpayer has more than 50 brewery customers, each of which specifies the length of time the ordered malt is to be aged and the particular mix of different malts desired. Externally the malt elevators look like barley elevators in which the barley is stored prior to the malt-making process. The taxable status of the storage elevators is not challenged by the taxpayer. The malt elevators contain rows of bins in which different types of malts are kept. The particular mix ordered by the customers is blended by regulating the flow of various malts onto conveyor belts beneath the bins. The final mix is transported to shipping bins, which are not involved in this appeal.

The three structures may be entered by employees for maintenance or cleaning but are not generally occupied by employees during the course of the manufacturing process. The attemporators, kilns and malt elevators are monitored on an almost totally automated basis from a central control room in a different location.

Employees are not inside the attemporators during any time they are operating. When employees enter the kilns each day to manually rotate the louvers and dump the tray floors, they must pass through an air lock adjoining the kiln because of the enormous difference in external and internal air pressure. The temperature within the kiln is reduced to 100 degrees during such times. Access to the top of the malt elevators for servicing the conveyor equipment is provided by a concrete stair tower or a man lift. It is very unusual for an employee to be inside a malt bin, and this never occurs when there is an appreciable amount of malt within the bin.

There are no plumbing, heating or cooling facilities within the three structures except as they specifically relate to the manufacturing processes which occur within

them. There is electric wiring for lighting and manufacturing purposes, but no toilets, rest areas or other "creature comforts" inside any of them.

We cannot improve on the trial court's designation of the central issue. It asked:

What is the meaning of "buildings or building components"? The noun "building", considered outside of any factual context is an inert concept noting in its broadest possible sense the enclosure of space. . . . Was it the intent of the legislature to exclude from exemption any creation which encloses space, even though it also may functionally contribute to the "transformation of substance"?

The answers to these questions are not clear from the face of the statute, even applying the appropriate rules of construction. Pursuant to those rules, a tax exemption statute is to be strictly construed against granting the exemption since "tax exemptions, deductions and privileges are matters of legislative grace." *Ramrod, Inc. v. Department of Revenue,* 64 Wis.2d 499, 504, 219 N.W.2d 604, 607 (1974). Moreover, the burden of bringing the property in question within the terms of the exemption is on the taxpayer, and any doubts that he has done so are to be resolved in favor of taxation. *Ramrod,* 64 Wis.2d at 504, 219 N.W.2d at 607; *First Nat. Leasing Corp. v. Madison,* 81 Wis.2d 205, 208, 260 N.W.2d 251 (1977). On the other hand, the supreme court has stated:

"[A] strict construction is nonetheless a construction, and an exemption statute need not be given an unreasonable construction or the narrowest possible construction. A 'strict but reasonable' construction seems to be the pithy and popular statement of the rule." *Columbia Hospital Assn. v. Milwaukee,* 35 Wis.2d 660, 668, 151 N.W.2d 750, 754 (1967), quoted with approval in *First Nat. Leasing Corp.,* 81 Wis. at 208–09, 260 N.W.2d at 253.

The "strict but reasonable" meaning of the statute in question is elusive when applied to the structures at

issue. The legislature plainly intended to exempt manufacturing machinery and equipment exclusively used in transforming raw products into merchantable goods, while withholding the exemption from buildings and building components. The three structures in this case all have the external appearance of buildings, but are designed to function exclusively as machinery. The attemporators are giant air-conditioners and humidifiers. The kilns are giant ovens. Neither could perform their intended functions without the walls, floors ceilings, and foundations which make them building-like in appearance. The malt-elevators, though less machine-like than the other two structures, are nonetheless more than passive storage units such as the barley or shipping elevators. Within them an organic change in the malt takes place which is essential to the production process. They are designed to custom-mix the different varieties of separately aged malts to the specifications of each customer. Their function is not dissimilar from that of smaller specific processing equipment designed, for example, to custom blend paints, dyes, or foods.

Neither the attemporators nor the kilns could be used as "buildings" in the commonly used sense of providing shelter for persons or animals, or storage space for property, without substantial alterations. While the malt elevators could conceivably be used to shelter and store malt, their use is committed to a more ambitious purpose.

■■■

When the meaning of a statute is not clear on its face, we may look to extrinsic sources to determine legislative intent.[2] Our examination of the legislative history of

[2] *Monson v. Monson,* 85 Wis.2d 794, 800, 271 N.W.2d 137 (Ct. App. 1978); *State ex rel. Gutbrod v. Wolke,* 49 Wis.2d 736, 742, 183 N.W.2d 161 (1971); *Kindy v. Hayes,* 44 Wis.2d 301, 308, 171 N.W.2d 324 (1969); *Perry Creek C. Corp. v. Hopkins Ag. Chem. Co.,* 29 Wis.2d 429, 435, 139 N.W.2d 96 (1966); *City of Milwaukee v. Milwaukee County,* 27 Wis.2d 53, 56, 133 N.W.2d 393 (1965).

sec. 70.11(27), Stats., persuades us that the legislature did not intend to include structures such as those at issue, which function as manufacturing machinery or equipment, within the "building-building component" exception to the M & E exemption.

The parties have stipulated that the language of the statute as finally enacted was adopted by a conference committee of the legislature after meetings with representatives of the department and of industry. The meetings were requested by the committee, which was studying a proposed draft of a senate bill creating the M & E exemption. As a result of these meetings, the representatives of industry and of the department agreed on certain changes in the original language, which were incorporated by the committee in the bill reported out to and passed without further alteration by both houses of the legislature.

The original draft of the bill excluded "structures or fixtures," rather than "buildings or building components," from the M & E exemption. It also required that property attached to real estate must be "capable of removal without substantial damage" to the real estate in order to qualify for the exemption. The latter requirement was stricken from the bill which was finally enacted, and the broad "structures or fixtures" language was replaced by the present, narrower "buildings and building components." But for these changes, there is little doubt that the property in question would not have qualified for exemption.

The stipulation recites that the phrase "buildings and building components" was adopted by the committee at the suggestion of industrial representatives, who expressly stated that the change in language would bring the bill into conformity with a similar phrase in 26 U.S.C.A. sec. 48(a)(1)(B) of the federal Internal Revenue Code relating to investment credits. That section provides the

credit for tangible personal property "used as an integral part of manufacturing," but excludes "a building and its structural components." A known body of federal law had developed to interpret this phrase.

The taxpayer contends that the legislature's adoption of the phrase suggested by the industrial representatives evinces its intent that the M & E exemption be construed in conformity with the federal investment credit statute. Under this approach, any property qualifying for the credit under federal authority, such as each of the structures involved in this case, would presumably be entitled to the M & E exemption. We agree with the department that this approach is unwarranted.[3] Although the credit and the exemption were doubtless enacted for similar reasons—to stimulate business and encourage industrial investment—they relate to different kinds of taxes and serve the intended purpose in different ways. In addition, the expressed intention of individuals advising the legislature, through a conference committee, is inconclusive evidence of an identical legislative intention.[4]

---

[3] *Ladish Co. v. Department of Revenue,* 69 Wis.2d 723, 233 N.W.2d 354 (1975), upon which the taxpayer relies, is inapposite. The case dealt with the construction of a state income tax statute which was virtually identical to its counterpart in the Internal Revenue Code, and an explanatory note to the bill which became the statute indicated that uniformity between state and federal laws was intended. *Master Lock Co. v. Department of Revenue,* 62 Wis.2d 716, 215 N.W.2d 529 (1974) and *Industrial Comm. v. Woodlawn Cemetery Asso.,* 232 Wis. 527, 287 N.W. 750 (1939), both of which dealt with identical state-federal statutes, are similarly distinguishable.

[4] *See A. O. Smith Corp. v. Department of Revenue,* 43 Wis.2d 420, 427, 168 N.W.2d 887, 890 (1969), where the supreme court ruled that " '[L]egislative acts must be construed from their own language, uninfluenced by what the persons introducing or preparing the bill actually intended to accomplish by it.' *Moorman Mfg.*

We need not adopt a strict conformity test, however, in order to accept persuasive reasoning of courts in other jurisdictions which have construed statutes similar to our own.[5] Several such cases, both federal and state, have resolved issues similar to that before us by rejecting a narrow "physical appearance" test and applying a "function or use" test. Under that test the central question is whether the structure is one "whose utility is principally and primarily a significantly contributive factor in the actual manufacture or production of the product itself." Mertens, 5 *Law of Federal Income Taxation* sec. 32A.14, at 50 (rev. ed. 1980).

In *Brown-Forman Distillers Corporation v. United States*, 499 F.2d 1263 (Ct. Cl. 1974), for example, the court held that large structures designed to age whiskey in a controlled environment, and which were entered by the taxpayer's employees only for repairs, maintenance, loading and unloading, were entitled to the investment credit. The fact that the structures "have features in common with buildings" was held not to be determinative. The real question, the court said, was "whether they are functioning or being used as 'buildings' in the taxpayer's hands." 499 F.2d at 1271. A major consideration in answering that question was that the working space provided in the structures for employees was no more than "merely incidental to the principal function or use of the structure." 499 F.2d at 1271. *Cf. Sunny-*

---

Co. v. Industrial Comm., 241 Wis. 200, 5 N.W.2d 743" [quoting Estate of Matzke, 250 Wis. 204, 208, 26 N.W.2d 659, 661 (1947)]. But see Buehler Bros. v. Industrial Comm., 220 Wis. 371, 373–74, 265 N.W. 227 (1936); Pellett v. Industrial Commission, 162 Wis. 596, 601, 156 N.W. 956 (1916); Sutherland, 2A Statutory Construction sec. 48.12 at 214–15 (4th ed. 1973).

[5] Cf. Master Lock Co. v. Department of Revenue, 62 Wis.2d 716, 215 N.W.2d 529 (1974); Columbia Hospital Asso. v. Milwaukee, 35 Wis.2d 660, 670, 151 N.W.2d 750 (1967).

*side Nurseries,* 59 T.C. 113 (1972), *appeal dismissed, see Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915, 918 n. 2, A.L.R. Fed. 299 (9th Cir. 1974), and *Arne Thirup,* 59 T.C. 122 (1972), *rev'd. sub nom. Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915, 39 A.L.R. Fed. 299 (9th Cir. 1974), holding that certain greenhouses were buildings, rather than machines, because the taxpayer's employees spent their full work days within them.

The fact that a structure could be physically altered to serve building-like, as well as machine-like functions, was held to be irrelevant to its tax status in *Yellow Freight System, Inc. v. United States,* 413 F. Supp. 357 (W.D. Mo. 1975), *rev'd on other grounds,* 538 F.2d 790 (8th Cir. 1976). The court observed:

Indeed, in their present form the structures are of no use to plaintiff or anyone else except for the purposes for which they were specifically designed and for which they are used. The fact that expenditures for labor and materials might render a structure suitable for other uses does not alter the fact that the structure in its unaltered state is not a 'building' . . . . *Id.* at 370.

The use-function approach has also been employed by state courts. In *Gulf Oil Corp. v. Philadelphia,* 357 Pa. 101, 53 A.2d 250, 172 A.L.R. 302 (1947), the Pennsylvania Supreme Court overturned a lower court's ruling that oil refinery tanks were not "machinery" entitled to exemption. In language especially pertinent to the malt elevators at issue in this case, the supreme court criticized the lower court's logic in concluding that because the action which took place in the tanks was "chemical," and not "mechanical," the tanks were merely processing agents and not manufacturing machinery. 357 Pa. at 108, 53 A.2d at 253, 172 A.L.R. at 307. The court said:

Much machinery today has only passive or motionless functions to perform in manufacturing. . . .

It is logical to hold that the storage tanks in which take place physical and chemical processes necessary to the refinement of oil, are machinery as it is to hold that the smelters used in making metal are machinery. 357 Pa. at 109–110, 53 A.2d at 254, 172 A.L.R. at 307–08. [Footnote omitted.] [6]

*See also Board of Assessors of Swampscott v. Lynn Sand & Stone Co.,* 360 Mass. 595, 277 N.E.2d 97, 99 & 99 n. 3 (1971), which held that "certain very bulky machinery:" such as a 50-ton silo and a 300-ton sand bin did not lose their "predominant aspect" as manufacturing machinery entitled to tax exemption merely by virtue of bulk or being affixed to buildings which themselves were taxable as real estate.

The department has brought to our attention *Public Service Elec. & Gas Co. v. TP. of Woodbridge,* 73 N.J. 474, 375 A.2d 1165 (1977), which held that structures housing energy generating apparatus of electric light and power companies were taxable "buildings," and not exempt "machinery" under that state's statutes. A lower court had held that such structures were exempt because they were " 'adapted and adaptable only to shelter and support generating equipment' and are therefore, in effect, 'Electric Generating Stations' . . . and hence part of the 'machinery, apparatus and equipment' exempt from direct property taxation under the act." 73 N.J.

---

[6] The supreme court was also critical of the lower court's conviction that silos, to which it had likened the refinery tanks, would not be exempt from taxation, observing:

Insofar as a silo's function is merely preservative it has no part in manufacturing but as the fermentation of the silage in the silo forms certain organic acids which prevent the development of molds on the fodder a silo does have, pro tanto, a part in the manufacturing of silage. The fermentation which goes on in the silo produces, under proper conditions, sweet "silage" as fodder. To that extent the silo may be properly considered as part of the machinery of producing fodder. 357 Pa. at 110 n. 2, 53 A.2d at 254 n. 2, 172 A.L.R. at 308 n. 2.

at 477–78, 375 A.2d at 1166. The New Jersey Supreme Court's disapproval of the lower court's determination does not support the department's position on this appeal. The supreme court noted that the structures in question were more than just shelters for equipment because they "are also workplaces for personnel," containing control rooms with such conveniences as heating, air conditioning, and toilets. It said that the word "building" must be given its "generally accepted meaning," and approved the following definition:

A "building" in the usual and ordinary acceptation of the word is a structure designed and suitable for habitation or sheltering human beings and animals, *sheltering or storing property, or for use and occupation for trade or manufacture.* 73 N.J. at 479, 375 A.2d at 1167. [Emphasis in original.]

That definition, which is comparable to the more detailed definition of "building and structural components" set forth in 26 C.F.R. sec. 1.48–1(e) with respect to the investment credit exception,[7] cannot be said to apply to

---

[7] 26 C.F.R. sec. 1.48–1(e)(1) defines "buildings and structural components" in pertinent part as follows:

The term "building" generally means *any structure or edifice enclosing a space within its walls,* and usually covered by a roof, *the purpose of which is, for example, to provide shelter or housing or to provide working, office, parking, display, or sales space.* The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. . . . Such term does *not include* (i) *a structure which is essentially an item of machinery or equipment,* or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for

any of the three structures at issue in this case. None of them is designed or suitable for the shelter of persons, occupation, or simple storage. Each is designed to process raw materials into a final product, and for no other purpose. They are also used for that and no other purpose.

A definition of "buildings" and of "machinery and equipment" which emphasizes actual function and use over physical appearance, sheer size, and remotely potential use, elevates substance over form. It also makes sense. Internal correspondence of the department, which are exhibits to the parties' stipulation, indicate that the department has inclined towards the functional approach as a matter of policy with respect to air conditioners and humidifiers, wood-kilns, brewery fermenting tanks, certain equipment used to age natural cheeses, and other items which in its view either are or "may have to be

---

other purposes. *Thus, the term "building" does not include such structures as* oil and gas *storage tanks, grain storage bins, silos,* fractionating towers, blast furnaces, basic oxygen furnaces, *coke ovens, brick kilns,* and coal tipples.

(2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components . . . relating to the operation or maintenance of a building. However, the term "structural components" *does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs.* Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components." . . . [Emphasis supplied.]

considered" as machinery entitled to exemption under the statute. As to such items, the department, like the other authorities cited in the opinion, has taken a broader view of the scope of the tax benefits granted to manufacturing machinery, as opposed to buildings, than the view which it now urges on this court. It offers no basis for distinction between air conditioners and attemporators, wood kilns and malt kilns, cheese aging equipment and malt aging-blending elevators. This court perceives no possible distinction.

For these reasons the judgment of the trial court is affirmed.

*By the Court.*—Judgment affirmed.