VILLAGE OF LANNON, Plaintiff-Respondent,

v.

WOOD-LAND CONTRACTORS, INC., Defendant-Appellant,†

Mary L. BARNEKOW, Defendant.

Court of Appeals

*No. 02–0236. Submitted on briefs October 10, 2002.—Decided December 26, 2002.*

2003 WI App 7

(Also reported in 659 N.W.2d 95.)

† Petition to review granted 4-22-03.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert F. Klaver, Jr.* and *James J. Carrig* of *Niebler, Pyzyk, Klaver & Wagner LLP* of Menomonee Falls.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Mark G. Blum* of *Hippenmeyer, Reilly, Moodie & Blum, S.C.* of Waukesha.

Before Nettesheim, P.J., Brown and Anderson, JJ.

¶ 1. BROWN, J. Wisconsin allows certain property to be exempt from general property taxes. One of these exemptions is for logging equipment. WISCONSIN STAT. § 70.111(20) (1999–2000),[1] entitled "Logging Equipment," gives an exemption for "[a]ll equipment used to cut trees, to transport trees in logging areas or to clear land of trees for the commercial use of forest products." Wood-Land Contractors, Inc., is in the business of clearing land for developers. Incidental to its business, it cuts trees, removes them from the developers' land, produces logs, firewood and wood chips from these trees and sells the products. The Village of Lannon sought to tax Wood-Land's tree cutting equipment. Wood-Land refused to pay the tax and the Village sued. We agree with the trial court that the statute was designed to give an exemption for those systematically involved in the logging business, not to those who incidentally cut logs and sell the products as a small part of an altogether different kind of business. We affirm the trial court's judgment that Wood-Land must pay taxes on its tree cutting equipment.

¶ 2. This case is here on review of a summary judgment that was granted after the parties agreed to the undisputed facts. The facts are as follows: Wood-Land is a contractor that clears land for developers. As part of its operations, it removes all of the timber from the site and either processes it at the site before removal or removes it to its facilities where the trees are turned into logs or firewood. Wood-Land owns approximately 1.3 million dollars in equipment. In 2001, Wood-Land had total sales of $749,697. Of this total, $666,150 came from "construction sales" and the

_____

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

remainder came from the sale of logs, firewood and wood chips. Thus, Wood-Land's sale of commercial forest products represents less than fifteen percent of its total sales. For the tax year 2000, the Village assessed personal property taxes of $15,398.63, which Wood-Land refused to pay.

¶ 3. Wood-Land's position before the trial court was straightforward. It noted that it cuts trees, the trees are cut to clear land and the trees are then allocated for commercial use of forest products. Therefore, Wood-Land asserted that it came within the exemption. The trial court did a statutory construction analysis. It gave special emphasis to the word "for" in WIS. STAT. § 70.111(20) as suggested by the Village. It consulted BLACK'S LAW DICTIONARY and WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY regarding the word "for" and determined that, in the context of the statute at hand, "for" means "for the purpose of" or "for the reason of." The trial court then concluded that because Wood-Land cuts trees both "for the purpose of" clearing land for its customers and also "for the purpose of" producing forest products, and because the production of forest products was not the "primary purpose" of such activity, the exemption should be denied. The trial court relied upon this court's opinion in *Village of Menomonee Falls v. Falls Rental World*, 135 Wis. 2d 393, 400 N.W.2d 478 (Ct. App. 1986). The trial court saw this case as establishing the law that unless the primary purpose of the business is one that the exemption is designed for, the exemption may not apply, even if—incidentally—the business might satisfy the statute. From this judgment, Wood-Land has appealed.

[1–5]

¶ 4. Our first order of business is to construe the statute. Statutory construction is a question of law. *Wis.*

*Cent. Ltd. v. DOR*, 2000 WI App 14, ¶ 9, 232 Wis. 2d 323, 606 N.W.2d 226. Therefore, we review the statute de novo. *Id.* In so doing, however, we value the trial court's opinion. Because this is a tax exemption case, the burden of establishing entitlement rests with the taxpayer. *Friendship Village of Greater Milwaukee, Inc. v. City of Milwaukee*, 181 Wis. 2d 207, 219, 511 N.W.2d 345 (Ct. App. 1993). Exemption statutes are strictly construed and must be clear and express. *State ex rel. Dane County Title Co. v. Bd. of Review of City of Madison*, 2 Wis. 2d 51, 61, 85 N.W.2d 864 (1957). If doubt exists, the doubt is resolved against the taxpayer. *See Friendship Village*, 181 Wis. 2d at 220. In analyzing a tax exemption claim, the taxpayer must show that the proffered construction is supported by clear evidence of legislative intent. *Owens-Illinois, Inc. v. Town of Bradley*, 132 Wis. 2d 310, 314, 392 N.W.2d 104 (Ct. App. 1986). The legislative intent is derived by giving the statutory language its ordinary and accepted meaning. *Id.* In the absence of a statutory definition or case law to define terms within the statute, the common and generally understood meaning of the term should be applied. *State v. City of Madison*, 55 Wis. 2d 427, 433, 198 N.W.2d 615 (1972).

¶ 5. Before we begin our statutory construction of the exemption statute, we point out that we will not consider disputed language in a statute in isolation, but in the context of the entire statute. *Town of Avon v. Oliver*, 2002 WI App 97, ¶ 7, 253 Wis. 2d 647, 644 N.W.2d 260, *review denied*, 2002 WI 109, 254 Wis. 2d 263, 648 N.W.2d 478 (Wis. June 11, 2002) (No. 01–1851). Rules of grammar and punctuation should not be applied at the expense of a natural, reasonable reading of statutory language, taking into account the

context in which it appears and the purpose of the statute, especially when the result would be an expansion or contraction of the statute contrary to its terms. *Peterson v. Midwest Sec. Ins. Co.*, 2001 WI 131, ¶ 23 n.7, 248 Wis. 2d 567, 636 N.W.2d 727.

■

¶ 6. We begin our analysis with the title. Although the title is not part of the statute and cannot defeat the language of the law, it is persuasive evidence of statutory interpretation. *Mireles v. LIRC*, 2000 WI 96, ¶ 60 n.13, 237 Wis. 2d 69, 613 N.W.2d 875. The title is "Logging Equipment." As stated by the Village, there is no case in Wisconsin defining the term. Nonetheless, we may resort to a recognized dictionary in order to gain understanding as to the common and generally understood meaning of the term. *Falls Rental World*, 135 Wis. 2d at 397. We have found cogent definitions of "logging" in both BLACK'S LAW DICTIONARY and WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY. We will italicize what we consider to be important as regards this case. BLACK'S LAW DICTIONARY defines "logging" as an industry which:

> [i]ncludes felling and preparation of logs for transport, log assemblage, and main log haul; it includes also production of large quantities of pulpwood, cross ties, poles, piling, mine timbers, veneer logs, bolts and miscellaneous other forms. (Citation omitted.)

BLACK'S LAW DICTIONARY 1091 (4th ed. 1968).

¶ 7. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defines "logging" as:

> [T]he *occupation* of felling trees and cutting them up into logs and transporting the logs to sawmills or to a place of sale. (Emphasis added.)

885

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1330 (1993).

¶ 8. From these definitions, we see that the statute applies to a specific genre known as the logging industry, an industry involved in the systematic cutting and transporting of logs for eventual commercial use. We emphasize the word "systematic" because it separates those in the logging business from those who incidentally cut trees as part of some other business.

■■

¶ 9. The logging industry has equipment which, the statute says, is used to cut trees, to transport trees in *logging areas* or to clear land for the commercial use of forest products. Wood-Land has not asserted that its employees cut and transport trees in logging areas.[2] Therefore, in order to come within the purview of the statute, Wood-Land focuses on the phrase "to clear land of trees for the commercial use of forest products." It claims that its equipment is used for such purpose.

¶ 10. At trial, the parties, and ultimately the trial court, focused on the term "to clear land of trees for the commercial use." As we explained at the outset, the Village construed the phrase to mean that the commercial use of forest products must be the *primary* reason why the land is being cleared. Wood-Land, on the other hand, noted that the word "primary" is not in the

---

[2] The dissent contends that we should remand so that Wood-Land can have the opportunity to put into evidence that it is, in fact, in the logging business. But Wood-Land had the statute in its hands when it applied for summary judgment. It agreed that all of the facts were undisputed. In its brief-in-chief, it did not ask for a trial, but asked for a decision favoring it as a matter of law. We are convinced that had Wood-Land in fact claimed that it was in the logging business, it would have made that claim in the trial court and asked for a trial to prove it.

statute and asserted that it does clear land and the trees that are cleared are processed for commercial use.

¶ 11. In determining whether the trial court correctly construed the phrase, we broaden the question a bit. Instead of concentrating on the term "to clear land of trees for the commercial use," we add the last part of the phrase and construe the term "forest products" as part of our interpretation of the whole phrase. In other words, we will review the following phrase, "to clear land of trees for the commercial use of forest products." In our view, the term "forest products" is a meaningful part of the phrase, especially in relation to the term we have earlier defined, *logging equipment.* We observe that the legislature did not write into the statute the term "to clear land of trees for the commercial use of *felled trees.*" It specifically and expressly used the term "forest products." What is a "forest product?" Again, Webster's helps us out. A forest is:

> [A] dense growth of trees and underbrush covering a large tract of land.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 890 (1993).

¶ 12. We surmise that most Wisconsinites would agree that this is the common and generally understood meaning of the term. A reasonable person would also not think of a tree standing in front of a residential lawn as a potential "forest product."

¶ 13. Again, we cannot take words in isolation, but must look to the relevant language in the whole statute. When we do, we see that this exemption applies to the logging industry, to those who are in the business of cutting and transporting trees in logging areas or who are in the business of clearing forest land for the express purpose of using the fruits of their labor for

eventual commercial use. Under this definition, Wood-Land does not qualify. Its business is to clear land for the purpose of giving developers what they want: land free from obstructions. That is what it gets paid for. While Wood-Land may incidentally fell trees as part of its business, it does not cut and transport from logging areas. And it does not go into a forest with the express purpose in mind of clearing land "for the purpose of" commercially using the felled trees. Any incidental value it gets from commercially selling the felled trees it carries from developers' property is collateral to its main occupation. Wood-Land is not engaged in the systematic occupation of logging.

¶ 14. While we do not think the statute is ambiguous, we may refer to legislative history in support of our construction. *State v. Timmerman*, 198 Wis. 2d 309, 321 n.3, 542 N.W.2d 221 (Ct. App. 1995). We note that in one of the drafts of the statute at hand, 1983 A.B. 38 stated:

> All equipment used to cut trees, for lumber to transport trees in logging areas or to clear land of trees *in lumbering.*

While the last part of the statute was changed to say "for the commercial use of forest products," we think the change still refers to the lumbering or logging industry. Wood-Land, plainly and simply, is not engaged in clearing the land for lumbering.

¶ 15. The parties spend much of the time in their briefs arguing about the meaning of *Falls Rental World.* The case *is* applicable, but not for the reason submitted by the Village, which reasoning was adopted by the trial court. In *Falls Rental World,* a rental center sought an exemption for its stock, claiming that it qualified as "merchants stock-in-trade." *Falls Rental World,* 135 Wis. 2d at 395. We held that even though worn-out

rental equipment might be moved out of stock and sold, the real purpose of having the stock was to rent it out, not to turn the product over. *Id*. at 398. We held that the statute was designed to provide an exemption for merchants who have stock on the shelves for a short time with the intent of *selling* the items. *See id*. Since the taxpayer in *Falls Rental World* was selling a service, not a product, its "stock-in-trade" was the performance of its goods and equipment. *Id*. Thus, we looked to the kind of business that the legislature intended to grant an exemption to and found it within the plain meaning of the statute. We did not adopt a "primary purpose" test. Here, just as the legislature did not intend to provide an exemption for businesses such as Falls Rental, it likewise did not intend to provide an exemption for businesses such as Wood-Land.

¶ 16. But even though *Falls Rental World* cannot be cited for the proposition that we look to the primary purpose rather than the incidental purpose of the taxpayer, the trial court's reasoning still makes perfect sense. We are convinced that the legislature crafted a narrow exemption for the logging industry whose existence is based upon cutting forest products in logging areas or cutting and clearing land in forests so that it can use the fruits of its labor for some commercially viable use. The legislature did not intend to grant this exemption to businesses outside the logging industry. So, even if *Falls Rental World* did not establish a "primary purpose test," we do. The bottom line is we must ask ourselves the purpose for which the tax exemption was granted. If it was for a specific industry, then all of those who incidentally may come within the statute, but who are not part of that industry do not get the exemption.

¶ 17. While there are no prior cases in Wisconsin adopting the "primary purpose test," we note that the test is not applied unless we are convinced that the legislature meant to give an exemption to a narrowly tailored business. If so, then those outside that business do not get the exemption even if they can argue that the wording of the statute includes them. As such, this case is not the first time a Wisconsin appellate court has adopted a similar rationale. In *Landish Malting Co. v. DOR*, 98 Wis. 2d 496, 498, 297 N.W.2d 56 (Ct. App. 1980), the supreme court read WIS. STAT. § 70.11(27) as allowing an exemption for business machinery used in manufacturing tangible personal property. *Landish*, 98 Wis. 2d at 498. The Department of Revenue contended that the disputed items of property, attemporators, kilns and malt elevators, were "buildings." *Id.* at 498–99. The court rejected the physical appearance test in favor of a "function and use" test. *Id.* at 506. Under that test, the central question was whether the structure is one "whose utility is principally and primarily a significantly contributive factor in the actual manufacture or production of the product itself." *Id.* The same test was applied in another case, *DOR v. Greiling*, 112 Wis. 2d 602, 607, 334 N.W.2d 118 (1983). That case involved greenhouses. *Id.* at 603. In both cases, the court looked to the legislative purpose for the exemption—to allow an exemption for components that are actively involved in the making of the product itself. In both cases, the court allowed the taxpayers to come under the exemption because they satisfied the primary purpose of the legislature's intent. Thus, in our view, these two cases provide the foundation for our decision in this case. The primary purpose of the statute is to

give an exemption to those systematically engaged in the logging industry. Wood-Land does not qualify.

¶ 18. Even if we are wrong in our construction of the law and even if Wood-Land's construction of the statute is reasonable, at the very most, all this does is make the statute ambiguous. Doubt still remains because our construction is just as reasonable. Long ago, our supreme court wrote about what we do when there is doubt with regard to a taxation exemption statute. In *Mitchell v. City of Horicon*, 264 Wis. 350, 352, 59 N.W.2d 469 (1953), the court wrote:

> ·Practical construction, it is true, has its place in the interpretation of statutes whose meaning is doubtful. The trouble with that argument here is that it is a fundamental rule of taxation that, if there is doubt, the doubt must be resolved against the party claiming an exemption.

¶ 19. We are satisfied that our construction is correct and gives vitality to the idea that the purpose of the statute was to provide a narrow exemption for Wisconsin's logging industry. Alternatively, even if Wood-Land's construction is a reasonable one, ours is equally so and all doubts are resolved in favor of the taxing authority. We therefore affirm the trial court's judgment ordering that Wood-Land pay taxes on its land clearing equipment.

*By the Court.*—Judgment affirmed.

¶ 20. NETTESHEIM, P.J. (*dissenting*). I agree with the majority that Wis. Stat. § 70.111(20) requires that Wood-Land be primarily engaged in a logging operation in a forest setting in order to qualify for the statutory tax exemption. However, I disagree with the majority's conclusion that the summary judgment

record entitles the Village to summary judgment. Instead, I see competing reasonable inferences on the question of whether Wood-Land's primary business activity is logging as contemplated by the statute or the clearing of land with timbering as an ancillary activity. I would reverse and remand for a trial on that question. Therefore, I respectfully dissent.

¶ 21. WISCONSIN STAT. § 70.111(20) exempts the following property from general property taxes:

> All equipment used to cut trees, to transport trees in logging areas or to clear land of trees for the commercial use of forest products.[1]

¶ 22. Both parties moved for summary judgment. The Village did not dispute that Wood-Land harvests trees and then processes the trees into wood by-products for commercial use. However, the Village contended that Wood-Land's primary business activity was to clear land for development and that Wood-Land's timbering operation was merely incidental to that primary activity. Wood-Land argued that the clearing of land is an obvious consequence of any timbering operation, and that its primary business activity was logging.

¶ 23. The Village's claim for summary judgment rested on two evidentiary themes: (1) certain advertis-

---

[1] The wording of WIS. STAT. § 70.111(20) presents a number of grammatical problems. First, it is not clear whether the prepositional phrase "in logging areas" modifies only the immediate preceding phrase "to transport trees" or also the earlier phrase "to cut trees." In addition, it is not clear whether the concluding prepositional phrase "for the commercial use of forest products" modifies only the immediate preceding phrase "to clear land of trees" or all of the preceding phrases. These uncertainties did not surface in the trial court because the discussion in that forum was whether Wood-Land's "primary" business activity was logging.

892

ings promoting Wood-Land as a tree-clearing and grubbing operation, and (2) financial records showing that Wood-Land reaped more of its income from its logging and clearing operations than from its sale of timber by-products.

¶ 24. Against this evidence, Wood-Land offered the affidavit of Steven Barnekow, a Wood-Land officer and employee, who offered the following description of Wood-Land's business operation:

> The business of Wood-Land Contactors Inc. is an integration of the cutting of trees at the lands of others, who contract for this service, the clearing of such lands of trees, and Wood-Land's commercial processing thereafter of the cut trees into forest products for sale to others at profit.

> At its operations site Wood-Land Contractors Inc. also has dedicated areas for the seasoning and processing of cut trees into commercial forest products.

Barnekow's affidavit goes on to describe the machinery that Wood-Land uses to perform its timbering operations. These include a felling machine with a bar saw attachment which enables the operator to seize a tree with a girth up to thirty-three inches and a height of eighty feet or greater. For smaller trees, Wood-Land uses more conventional timbering machinery: skidsters with front-end attachments that grasp trees by the trunk, holding them upright, with a shear at the base; brush hogs; and chain saws.

¶ 25. Wood-Land transports some of the felled trees to an on-site chipper machine within the logging area for processing into wood chips. Other trees are either loaded onto log racks and hoisted by hook truck or trailer, or are loaded directly onto log trucks or pup trailers and transported to Wood-Land's off-site opera-

tions facility for processing. Barnekow described this processing operation as follows:

> Saw logs in the logging industry refer to sections of quality trees, (e.g. walnut, maple, white spruce), cut to 8 to 20 foot lengths, suitable for sale to lumber mills for their milling of the logs into boards, veneer or similar product for wholesale or retail sale.
>
> Wood-Land regularly, and as part of its business operations, cuts sections of such felled trees into commercially suitable lengths, for the sale of them as saw logs to lumber mills. In the year 2000 Wood-Land sold saw logs at contract prices totaling $36,452. In the year 1999, the total was $52,050.
>
> Trees of less than saw log quality are processed by Wood-Land into fireplace/wood burning stove firewood.

Other trees not suitable for conversion to saw logs or firewood are processed into whole tree wood chips. This material is then sold for commercial use and Wood-Land advertises such products for sale.

¶ 26. Barnekow also explained what Wood-Land does not do:

> Wood-Land does not engage in landscaping. In cutting trees and clearing trees from land, it undertakes no design or planning work, no grading, no terra-forming, no undertakings regarding subsequent plantings, land features, structures or uses of the land .... How the land looks or is used after Wood-Land's work is not part of its business.

¶ 27. The trial court's findings essentially track Barnekow's summary judgment affidavit. The trial court described Wood-Land's business activity as follows:

> Wood-Land clears trees from the lands of others under contract. It then processes the trees into logs, firewood,

894

and wood chips which it advertises for sale and sells. This processing includes machining of the wood at the removal site and back at Wood-Land's yard. Wood-Land often clears land that is to be developed or used by others for purposes other than further tree cultivation. But Wood-Land does not grade, prepare, plan, or involve itself in any activity other than the removal of trees from the land and subsequent processing trees into logs, firewood, and chips.

. . . .

It is beyond dispute that much of Wood-Land's equipment is used to "cut trees," to "transport trees in logging areas," or to "clear land of trees." It is also clear that the logs, firewood, and wood chips produced from the trees and sold by Wood-Land are forest products which are commercial in use.

¶ 28. Despite these findings, the trial court agreed with the Village's argument that Wood-Land did not qualify for the exemption because Wood-Land's primary business purpose was to clear land for development, not to convert the harvested timber into commercial products. On this basis, the trial court awarded summary judgment to the Village.[2] The majority upholds that ruling. I disagree.

---

[2] In making its ruling, the trial court relied on *Village of Menomonee Falls v. Falls Rental World*, 135 Wis. 2d 393, 400 N.W.2d 478 (Ct. App. 1986). There, a rental company occasionally sold some of its products that were no longer useable as rental property or when a rental customer would ask to purchase a product. *Id.* at 395. Based on these isolated and occasional events, the rental company contended that its rental inventory was stock-in-trade, entitling it to the exemption conferred by WIS. STAT. § 70.111(17). *Falls Rental World*, 135 Wis. 2d at 395. We held that the rental company was not entitled to the exemption because the business activity of the company was to provide a service through the rental of its

¶ 29. For purposes of this dissent, I will allow that the evidence cited by the Village demonstrates a prima facie case for summary judgment. *See Jones v. Sears Roebuck & Co.*, 80 Wis. 2d 321, 326–27, 259 N.W.2d 70 (1977). Therefore, I turn to the next step in summary judgment methodology—whether the evidence offered by Wood-Land created a material issue of fact. *See Transp. Ins. Co. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 291, 507 N.W.2d 136 (Ct. App. 1993).

¶ 30. The majority places great weight on the fact that Wood-Land's timbering operation serves to clear the land on which the operation is conducted. However, WIS. STAT. § 70.111(20) does not negate the exemption if the effect of the logging operation is to clear land. As a matter of fact, *the statute expressly envisions the clearing of land:* "to clear land of trees for the commercial use of forest products." *Id.* Indeed, I have difficulty envisioning a situation where a logging operation will not result in the clearing of land.

¶ 31. The majority also says, "[Wood-Land's] business is to clear land for the purpose of giving developers what they want: land free from obstructions. That is what it gets paid for." Majority at ¶ 13. This reasoning fails on two fronts. First, as I have already noted, the

products. *See id.* at 398. That essential business purpose was not changed by the fact that the company occasionally ridded itself of outmoded products or occasionally sold a product to a rental customer. *See id.*

As this dissent will reveal, I see competing reasonable inferences from the summary judgment evidence as to whether Wood-Land's business model constitutes two discrete operations or a single unitary operation. If the former, the trial court will have to decide which operation is primary, akin to the analysis in *Falls Rental World.* If the latter, the court need not perform that exercise and *Falls Rental World* would not apply.

statute contemplates that the clearing of land will be a consequence of a logging operation. In short, Wood-Land does exactly what the statute envisions: "clear land of trees for the commercial use of forest products." Wɪs. Sᴛᴀᴛ. § 70.111(20). Second, I fail to see how the motives of the land owners factor into the statutory analysis. The statute requires an examination of Wood-Land's primary reason for the use of its logging equipment, not an examination of the land owners' motives for wanting the timber removed and their lands cleared.

¶ 32. The majority also concludes that because some of Wood-Land's customers want their land cleared of timber and because Wood-Land satisfies that need, Wood-Land is not engaged in the logging business for purposes of Wɪs. Sᴛᴀᴛ. § 70.111(20). But in making that conclusion the majority fails to address Barnekow's affidavit which contends that while land clearing is an obvious consequence of timbering, it is not the primary business function of Wood-Land. I conclude that the summary judgment record supports the competing inferences drawn by both parties in this case and that those inferences are reasonable. As such, this case should go to trial.

¶ 33. Moreover, I fear that the majority has looked at the evidence only from the standpoint of the Village. For instance, the majority says, "We are convinced that had Wood-Land in fact claimed that it was in the logging business, it would have made that claim in the trial court and asked for a trial to prove it." Majority at ¶ 9 n.2. However, Barnekow's affidavit establishes that Wood-Land is engaged in a classic logging operation. Wood-Land owns and operates sophisticated machinery uniquely designed for logging. Using this machinery, Wood-Land harvests timber,

which results in the clearing of lands. Wood-Land then transports the timber to either its on-site or off-site machinery for processing into saw logs, firewood and wood chips, which are sold commercially. Barnekow's description of Wood-Land's operations reflects the very scenario envisioned by WIS. STAT. § 70.111(20), which exempts equipment used "to cut trees, to transport trees in logging areas or to clear land of trees for the commercial use of forest products."

¶ 34. The majority also holds that Wood-Land is not "involved in the systematic cutting and transporting of logs for eventual commercial use." Majority op. at ¶ 8. Therefore, according to the majority, Wood-Land falls into the category of those "who incidentally cut trees as part of some other business." *Id*. However, as indicated above, Barnekow's affidavit demonstrates that Wood-Land's business model is a logging operation.

¶ 35. The majority also says that Wood-Land's operations are not conducted in a forest setting. But here again, the evidence allows for competing reasonable inferences. The fact that Wood-Land has advertised as a tree clearing operation might support the argument that its principal business operation is the clearing of land. However, other of Wood-Land's advertising promotes the commercial wood products resulting from its timbering operation. Moreover, the use of a felling machine sufficient to harvest 80 foot trees, skidsters with grapling attachments, brush hogs, and a saw milling operation capable of producing eight- to twenty-foot saw logs for further sale to the industry hardly suggests an operation that harvests, in the words of the majority, "tree[s] standing in front of a residential lawn." Majority at ¶ 12.

¶ 36. The resolution of this case rests, in part, on Wood-Land's primary business intent. Does Wood-Land

exist to provide land-clearing services or does it exist to perform logging operations within the meaning of WIS. STAT. § 70.111(20)? Intent is a question that does not lend itself to summary judgment methodology. *Lecus v. Am. Mut. Ins. Co.*, 81 Wis. 2d 183, 190, 260 N.W.2d 241 (1977) (the issue of intent is not one that properly can be decided on a motion for summary judgment). Moreover, on summary judgment, the burden is on the *moving party* to establish the absence of a genuine disputed issue as to any material fact. *Kraemer Bros., Inc. v. U.S. Fire Ins. Co.*, 89 Wis. 2d 555, 565, 278 N.W.2d 857 (1979). As such, it was the Village's obligation to demonstrate a right to summary judgment "with such clarity as to leave no room for controversy." *Id.* at 566. Finally, the court must view the evidence, or the inferences to be drawn therefrom, in a light most favorable to the party opposing the motion. *Id.* at 567.

¶ 37. Bearing these black letter law principles of summary judgment in mind, I would hold that the summary judgment record reveals competing reasonable inferences in favor of both parties as to Wood-Land's primary business purpose and intent.

¶ 38. Alternatively, the majority says that even if its analysis of the summary judgment record is wrong, the Village nonetheless prevails in this case because tax exemption statutes are to be construed against the party claiming the exemption. Majority at ¶ 18. I fully accept this rule, and I further agree that it has a role to play in this case. But I contend that the majority has the cart before the horse in applying the rule at this pretrial stage of the proceedings. When applying a rule of statutory construction to a set of facts, *the court must first know what the facts are.* Instead of applying the rule at summary judgment where the evidence allows for competing reasonable inferences as to whether

Wood-Land is entitled to the statutory exemption, I would submit that question to a jury together with the jury instruction regarding the presumption.

¶ 39. I would reverse the trial court's grant of summary judgment to the Village and remand for a trial on the question. Therefore, I respectfully dissent.